## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| TIMOTHY J. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:16-cv-00542-ECM-SMD |
| | ) | |
| AUTO-OWNERS INSURANCE | ) | |
| COMPANY, a Michigan corporation; | ) | |
| OWNERS INSURANCE COMPANY, | ) | |
| an Ohio corporation, | ) | |
| | ) | |
| Defendants. | ) | |

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COME NOW Defendants AUTO-OWNERS INSURANCE COMPANY and

OWNERS INSURANCE COMPANY ("Auto-Owners") and file this brief in

support of their motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56, requesting that the Court enter an order granting judgment as a matter

of law.

## I. INTRODUCTION

Plaintiff Tim Thomas ("Thomas") seeks judgment against Auto-Owners for

failing to settle a lawsuit filed against him by three plaintiffs, Maryah Annis

("Annis"), Randall Heard and Donna Heard (the "Heards"). (Doc. 1). These

plaintiffs won a jury verdict against Thomas for $3,800,000. *Id*. This verdict was in excess of Auto-Owners' liability policy limits of $500,000. *Id*.

Thomas, who ran a stop sign and injured three (3) others, says he is entitled to a monetary judgment against Auto-Owners for the full amount of the judgment against him, plus an award for mental anguish <u>and</u> punitive damages. (Doc. 1 at p. 21). He brings causes of action sounding in: (1) Negligent and/or Wanton Failure to Settle; (2) Bad Faith Failure to Investigate, Defend and Settle; and (3) Bad Faith Failure to Indemnify. (Doc. 1 at pp. 19-27).

Auto-Owners denied the allegations of negligence and bad faith, stating that it had a sincere and honest belief that the case was evaluated reasonably based both upon the advice of Thomas' insurance retained counsel and its professional experience.[1] (Doc. 24). Auto-Owners moves for partial summary judgment on grounds that it had a good faith right, as a matter of law, to defend the underlying claim in the face of disputed liability (as to one plaintiff), disputed damages (as to

---

[1] Auto-Owners filed a counterclaim alleging that Thomas failed to cooperate in his own defense, and lied about whether he had permission to drive the truck in the first place. (Docs. 26 & 55). While Auto-Owners does not move for summary judgment on the counterclaim due to contested issues of fact, it is important for the Court to take into consideration Thomas' own actions which led to Auto-Owners undertaking his defense and how his lies had a negative result on a run-away verdict.

all plaintiffs), and a recommendation from Thomas' own insurance retained counsel that the case was not worth $500,000.

At the outset, Auto-Owners challenges Thomas' standing to sue, which would entitle Auto-Owners to judgment as a matter of law on all claims. The reason being is that Alabama law prohibits the assignment of an insurance tort claim to third parties. However, that appears to be exactly what Thomas did when he entered into a "Fee Sharing Agreement" with the underlying plaintiffs. (Exh. 30). Thomas was jobless, penniless and had no assets; yet, his agreement to enter into the "Fee Sharing Agreement" created the *appearance* of an asset the underlying plaintiffs could use to collect the full amount of the judgment. The effect is, Thomas now stands in their shoes, acting as their proxy, keeping a commission on any potential recovery. The underlying plaintiffs meanwhile demand a portion of any potential punitive verdict as an added benefit, a recovery they have no a right to pursue under Alabama law.

Auto-Owners has spent significant sums of money and effort defending Thomas. Auto-Owners then paid $500,000 to the underlying plaintiffs' counsel, plus pre-judgment interest which had accrued since the entry of the final judgment, totaling $1,238,657.54. (Exh. 27). Auto-Owners had a multitude of reasons not to settle for the policy limit before trial. However, Thomas' counsel now wants to use a *post hoc,* "I told you so," hindsight standard as a new means by which to prove

that an insurer breached its duty of care and failed to act in good faith.  This simply

is not the law, and, as such, Auto-Owners is entitled to judgment as a matter of law.

## II. STATEMENT OF UNDISPUTED FACTS

**A.     History of the Underlying Claim, Claims Investigation, and Negotiations Leading up to Trial.**

On October 15, 2013, Thomas, was driving a 1997 Dodge Dakota truck on a

country round in Geneva County, Alabama. (Exh. 1, Accident Report). The truck

did not belong to him, but it was owned by an individual named Peggy Anderson.

*Id.* He ran a stop sign injuring himself and three (3) others. *Id.* The persons hurt in

the crash included Randell and Donna Heard, of Huntsville, AL, who occupied the

other vehicle *Id.*, and Maryah Annis, a teenage passenger with Thomas. *Id.*

According to the police report, the Dodge Dakota was covered by a liability

insurance policy from Owners Insurance (a/k/a Auto-Owners) for which Peggy

Anderson was the named insured. (Exh. 1). On October 23, 2013, counsel for the

Heards (Brent Jordan) sent notice to Auto-Owners of his representation and asked

to know the available limits. (Exh. 2). That same day, Auto-Owners opened a claim

file in its Montgomery claims branch. (Exh. 3, Claim Notes). The claim was assigned

to adjuster Cary Manning. (Exh. 4, Manning Dep. 69-70).

Manning began gathering as much information as possible. (Manning Dep.

47-48). Manning was looking both at the issue of liability (*Id.* at 30), the types of

injuries reported, and the permanency of those injuries. (*Id*. at 30, 48). The goal is to settle a claim within the adjuster's authority if possible. (*Id*. at 35-36). Even though Manning received a letter from an attorney saying his client's injuries were "serious," it still was necessary to gather all of the medical records, including those pre-existing the accident, to verify the injuries were suffered in the crash. (*Id*. at 64).

Manning also needed to check to see if coverage existed. (Manning Dep. 25). A question was whether Thomas (who was not a named insured) had permission as defined by the policy. (*Id*. at 27-28). The reason this was important was because the policy states that Auto-Owners will pay damages for bodily injury for which you are legally responsible, defining "you" as, including: "(3) on behalf of any person using your automobile (that is not a trailer) with your permission or that of a relative." (Exh. 5, Policy, at bates 01037). "Related" persons authorized to give permission specifically listed in a policy declaration were (1) Peggy Anderson; (2) Charles Brooks; or (3) Daniel Anderson. (Exh. 5 at 01016).

Manning called Anderson on October 25, 2013 and noted in his file that "[d]river did have permission to drive the vehicle." (Manning Dep. 74). He did not recall the specifics of what she said, but if she did not specifically tell Thomas he could not use the truck, then he had permission. (*Id*. at 75-76). As such, Manning determined this to be a covered loss. (*Id.* at 80).

Manning also was investigating more details on the issue of liability, for which he hired a reconstruction company, Rimkus. (Manning Dep. 81). Rimkus completed its investigation on November 19, 2013 and confirmed that the accident was Thomas' fault. (*Id*. at 87). Auto-Owners was accepting liability <u>only</u> as to the Heards, though, as Auto-Owners did not yet know the legal liability owed to a passenger, such as with Annis. (*Id*. at 112).

Manning summarized his findings on December 12, 2013 noting that he had received notice of a lawsuit filed by Annis. (Manning Dep. 101 and Ex. 6).[2] Even though Annis had filed a lawsuit and the Heards sent an attorney letter, there was not enough information to warrant paying out the policy limits. (*Id*. at 113-114).

Manning assigned the defense of the Annis lawsuit to a highly experienced local defense attorney,[3] Merrill Shirley, on December 23, 2013. (Exh. 3 at bates 00019). After the Heards filed suit,[4] Manning assigned that case to Shirley. (*Id.* at 00018). Auto-Owners wrote a letter to Thomas informing him of the assignment of counsel. (Exh. 9). Auto-Owners' agreement to defend Thomas in the lawsuit(s), and

---

[2] This lawsuit was filed on November 29, 2013. (Exh. 6, Annis Complaint).

[3] Practicing defense litigation for 40 years. (Shirley Dep. 64).

[4] The Heards filed suit on January 24, 2014. (Exh. 7, Heard Complaint) (consolidated by Orders of Consolidation, *see* Exh. 8).

to pay any judgment up to the policy limits[5] included a condition. (*Id.*) Thomas was required to cooperate in his defense pursuant to V.2. of the insuring agreement, which states: "[y]ou and any person seeking coverage under this policy must cooperate with us in the investigation, settlement, or defense of any claim or suit." (Exh. 5 at 01047).[6] Thomas signed this cooperation agreement. (Exh. 10).

As the cases progressed through discovery, Shirley regularly reported to Auto-Owners with details about the parties' injuries as well as details about Thomas admitting he drank alcohol before the accident. (Manning Dep. 120-121). When asked how he viewed this information, Manning testified that he relied upon attorney Shirley to gather the necessary information and "advise us." (*Id.* at 122-123, 25-26, 28-29). This is in line with the Auto-Owners' claims manual (and training) that instructs claims professionals to seek recommendations and input from local counsel on settlement values. (*Id.* at 145, 148).

Manning's last day of work at Auto-Owners (and thereby on this file) was in August 2014. John Gilmore, another adjuster in the Montgomery office, was then

---

[5] Aggregate limit of $500,000, plus interest and costs. (Exh. 5 at 01013).

[6] Other relevant provisions of the Auto-Owners policy included two key provisions at issue in this case. First, any interest arising under the policy cannot be assigned to third parties (Exh. 5 at 01048). Second, Auto-Owners would only pay *premiums* on appellate bonds in the event of a verdict against Thomas, but it would "not apply for or furnish such bonds." (*Id.* at 01040).

assigned the case. (Manning Dep. 96, 142; Exh. 11, Gilmore Dep. at 36).  Gilmore reviewed the file materials in early September 2014. (Gilmore Dep. 77). He acknowledges that his duty was to protect Thomas' interest.  (*Id.* at 82-84). In doing so, he was work with defense counsel upon whom he was relying to do "the bulk of the investigation." (*Id.* at 85).

On November 25, 2014, plaintiffs sent letters to Shirley demanding policy limits of $500,000 be paid no later than December 16, 2014. (Gilmore Dep. at Ex. 12 and 13). Shirley reported the demands to Auto-Owners via email of November 26, 2014. (Exh. 12, Shirley Dep. at Ex. 69). Gilmore asked Shirley for his opinion (Shirley Dep. Ex. 5; Gilmore Dep. Ex. 15). Gilmore, like Manning, believed it important to rely upon experienced local counsel. (Gilmore Dep. 236).

Gilmore recapped his discussions with Shirley via email to in-house legal. Specifically, Gilmore listed the remaining questions about the extent of the alleged injuries, the amount of medical specials, and the true impact of Thomas' alleged use of alcohol. (Gilmore Dep. Ex. 15;  Exh. 13, Bernardi Dep. at Ex. 17). While an allegation was made that Thomas had .068 blood content at the hospital, Gilmore knew that was under the legal limit for intoxication and Thomas did not appear impaired before the crash. (Gilmore Dep. 203-204, 236). Gilmore believed the settlement value of each claim was less than policy limits: being $75,000 for Annis (Gilmore Dep. 168, 187), Randell Heard at $200,000 (*Id*. at 175, 187) and Donna

Heard at $50,000 (*Id.* at 176, 187). Given the threat of an excess verdict made by counsel, Gilmore sent Thomas an "excess letter" notifying him of his right to advice from his own counsel. (*Id.* at 201 and Ex. 10-11).[7]

Shirley testified it is common for carriers to seek his advice and opinions on the value of cases. (Shirley Dep. 73, 156). In this case, he believed that while there was evidence Thomas was negligent, there was insufficient evidence of wantonness. (*Id.* at 57). The question of the application of the guest-passenger statute to the Annis claim was also an issue. (*Id.* at 231). When it came to the severity of the injuries claimed by the plaintiffs, they were not as "grave and graphic" as their attorney portrayed them. (*Id.* at 157, 174-175). And while plaintiffs had retail medical bills of over $300,000, the actual cost was substantially less. (*Id.* at 161).

Shirley believed wantonness (and punitive damages) was defensible because:

(1) there was a question on whether the blood alcohol reading was correctly recorded at the hospital (Shirley Dep. 94);
(2) Amber Foster, Annis' mother, testified that Thomas was in control of himself before her daughter got in the truck with him, otherwise she would not have let her ride with him (*Id.* at 98-99);
(3) the facts of the accident was that Thomas merely stopped (or was stopping) at a stop sign and failed to appreciate an oncoming vehicle (*Id.* at 99-100);
(4) plaintiffs' expert could not say alcohol "was impacting or affecting Mr. Thomas." (*Id.* at 104); and

---

[7] There were several attempts to mail the excess letters, but they were being returned, which is why there were several excess letters sent.

(5) the defense expert was "strong" in saying that he did not believe the level found, if correct, suggested recklessness on the part of Thomas. (*Id.* at 110).

While Shirley appreciated the fact that the presence of alcohol can make a jury "hostile," he felt this "case had its own unique and peculiar facts…". (Shirley Dep. 103-104). In proceeding in this defense, Auto-Owners never denied a request by Shirley to do anything he needed to defend Thomas. (*Id.* at 80, 248-249).

Shirley spoke to Thomas about the demands, explaining the case to him. (Shirley Dep. 163-164). Thomas disputed the allegations he was mentally ill, alcohol dependent, and impaired, maintaining that he was being falsely accused by the plaintiffs. (*Id.* at 88, 89). He sent Shirley emails, text messages and Facebook messages purporting to show how he was a victim of lies concocted by the plaintiffs to get money. (Exh. 14).  Unbeknownst to Auto-Owners, Thomas was even sending messages during the course of discovery to Annis' mother (Amber Foster), offering to settle the case himself, and lamenting how his "like-family" were wrongfully accusing him of being a bad person. (Exh. 15; Shirley Dep. 129-131, 136).

The parties were ordered to mediation in July 2015. (Exh. 16).  By then the claim was being handled by Loretta Grantman. (Gilmore Dep. 201). Accompanying her at the mediation was also the Montgomery Branch manager, Nicole Perkins. (Exh. 17, Grantman Dep. at 25; Exh. 18, Perkins Dep. at 44).  Auto-Owners asked Shirley, before the mediation, to provide a thorough evaluation of the claims against

10

Thomas. (Perkins Dep. 50-52).  Perkins perceived Shirley was very confident in his positions.  (*Id.* at 98). Auto-Owners relied heavily on him to know the venue and case values.  (*Id.* at 54).

On June 8, 2015 Shirley sent this comprehensive evaluation letter, breaking down each of the individual claims, and suggested the following:

> Annis: settlement and verdict = $100,000 - $125,000
>
> Randell  Heard:  settlement  =  $125,000-$135,000  and  verdict  =  $160,000 - $180,000
>
> Donna Heard: settlement = $40,000 - $50,000 and verdict = $60,000 - $70,000)

(Exh. 19; Shirley Dep. 253-255). In so doing, Shirley testified he was taking into consideration his impression of the witnesses. (Shirley Dep. 250-251). He was also taking into consideration the reduced subrogation amounts of the medical billing, which he believed to the normal practice for Geneva County. (*Id*. at 275)

Auto-Owners came to the mediation with the intent to resolve the claim. (Shirley Dep. 256). The case did not settle, however, as the underlying plaintiffs would not come off of the limits demands. (Perkins Dep. 68, 106).

A few weeks before trial, counsel signaled they might shave $10,000 (collective) off of limits. (Perkins Dep at 194). According to Perkins, in light of Shirley's evaluation, she was never shown by the plaintiff attorneys why they thought the claims were worth as much as policy limits (*Id.* at 196).

A jury trial was held on August 24, 2015 in Geneva County, Alabama before the Honorable William H. Filmore, Circuit Judge. At no time during the trial did plaintiffs' counsel signal they wanted to negotiate off of limits. (Shirley Dep. 257). The resulting verdicts entered on August 28, 2015, totaled $3.8 million. (Exh. 20). Despite over forty two (42) years of practicing law and trying cases in Geneva County, Alabama, this is the first case that Shirley tried that ended up resulting in an excess verdict situation. (Shirley Dep. 245-247). This verdict was outside the realm of any reasonable expectation in Shirley's opinion. (*Id*).

**B.     The Trial, Thomas' Change of Story, and Post Verdict Refusal to Remit Verdict Based on the Lack of Credibility**

During the trial, Thomas' testimony was softer on the issue of his impairment than in prior sworn testimony. In response to direct questions on whether he was impaired, Thomas stated that it was *possible* he had drank more than one tall-boy beer and "could have" had more. (Exh. 21, Trial Transcript at pp. 350, 351, 354). As to whether he also had taken prescription drugs, he testified it was *possible* he may be mistaken about his mixing prescription drugs with alcohol. (*Id.*)

Thomas had insisted in his deposition that he had only one (1) tall-boy and was not in any way impaired. (Exh. 22, Tim Thomas Dep. in underlying cases, at pp. 44, 60, 84). This drastically changed the nature of the case, to the extent that his own lawyer, Shirley, refused to ask him any questions on cross examination in an attempt to rehabilitate Thomas in fear he may change his story again. (Shirley Dep.

12

211-20, 264-65). Shirley was "very upset with those responses in view of the particular effort to make certain, we didn't need to have a mix-up about whether, you know, he had one beer that afternoon." (*Id*. at 217).

Thomas' lack of candor at trial became the centerpiece of plaintiffs' arguments a trial. (Shirley Dep. 259-260). This was also one of their main arguments in response to post judgment motions on remittitur. (Exh. 23; Shirley Dep. 260). Post verdict, the trial court agreed, denying Thomas' motions for new trial and for remittitur of the verdict. (Exh. 24). The court found Thomas to have been uncredible in his attempts to cover up his intoxication, specifically writing, "his attempts to cover up or deny the effects of his intoxication or his conduct just inflamed the jury." (Exh. 24). For this reason, the court refused to also consider any testimony by Thomas regarding his lack of financial ability to pay a large judgment:

> [i]f the witness on the affidavit is *found not to be a credible witness by the court*, then verification of that information would be necessary to convince the court that the contents are true. Such was not provided, and, therefore, since the *Defendant is not credible*, the Court finds no evidence of the Defendant's true financial condition, and thus, conclude that the financial condition of the Defendant was not a factor….

(*Id*.).

Auto-Owners appealed the denial of post judgment motions on Thomas' behalf. It retained appellate counsel, Judson Wells and Joe Driver of the Carr Allison firm, as well as former Alabama Supreme Court Justice Bernard Harwood. In their

briefs supporting new trial, Thomas' new counsel argued that he was penniless and, as such, should be relieved of the excessively high award. (Exh. 25). In response Plaintiffs' counsel pointed again to Thomas' "selective memory" at trial, saying in their briefs:

> [It is] only when questions touched upon his driving actions prior to the wreck, liability for the wreck, how much alcohol he consumed, and what pills he took, did Thomas have difficulty remembering the facts.

(Exh. 31, Brief of Appellees at p. 5, Footnote 2).

The final opinion of the Alabama Supreme Court did just that on November 3, 2017. The Court followed the trial court's lead and declined to consider Thomas' post judgment motions, finding him to be completely uncredible. (Exh. 26, Opinion of Alabama Supreme Court, at pp. 10-12).

After this opinion issued, Auto-Owners paid to Plaintiffs' counsel $1,238,657.54, which included interest accrued since the jury verdict. Auto-Owners also paid the cost fee bills in the total amount of $38,361.84. (Exh. 27).

## C.   Post-Verdict Discovery and the Execution of a "Fee Share Agreement"

Underlying plaintiffs' counsel served Thomas with post judgment interrogatories in aid of execution. The first question was whether Thomas ever demanded the case settle for policy limits before trial. (Shirley Dep. at Ex. 6 &7). Thomas, in sworn answers given on December 9, 2015, stated he had not. (*Id.*)

These interrogatories also included questions about Thomas' assets, to which he testified under oath that he had no money, owned no property, and had no assets for the plaintiffs to collect upon (Exh. 28).[8] In support of the appeal, counsel for Auto-Owners attempted to get Thomas to sign an affidavit to this effect, but now Thomas was living in Illinois, had no ID and no means of transportation.  (Shirley Dep. 210, 280).

Even until this day, no one has attempted to collect any money from Thomas. Thomas says that he received an unsolicited letter from attorney Belt after the verdict after which signed "something." (Exh. 32). Just months later, during the pendency of the appeal, Thomas signed a "Fee Sharing Agreement" with underlying plaintiffs and counsel. (Exh. 30). This lawsuit is what immediately followed.

The "Fee Sharing Agreement" defines Thomas as a judgment creditor owing money to the plaintiffs.  (Exh. 30). The agreement states that to the extent there are any rights the underlying plaintiffs would have to collect on any assets Thomas owned (again, which he had none), they would agree to forbear any such action. (*Id.*) As a condition, Thomas must file this lawsuit against Auto-Owners. (*Id.*) The underlying plaintiffs (and their counsel) thereby assume *de facto* ownership of Thomas insurance claim, and they are now direct beneficiaries of any award entered

---

[8] Thomas later responded to discovery in this case that he continues to have no assets. (Exh. 29).

15

against Auto-Owners. (*See*, *Id*.) Now working together, these formerly adverse parties claim that they now share in a "common interest" in a suit against Auto-Owners that they both intend to benefit from financially. (Doc. 70, Plaintiff's Response to Auto-Owners Motion to Compel).

Auto-Owners later discovered an additional fact that were unknown to Manning, who may have incorrectly assumed Thomas had permission to use the Anderson vehicle; namely, it has been revealed that Charles Brooks, one of the related insureds who could give permission per the declarations page, did not, in fact, give permission (Exh. 33). Peggy Anderson, the named insured on the policy, testifies by declaration (Exh. 34) that no one ever asked her directly whether Thomas had permission to drive the truck. In their minds, the truck was "stolen" when Thomas picked up a teenage friend half his age and later caused a crash.

### III.   <u>EXPERT TESTIMONY</u>

Thomas has disclosed the findings of two experts, Tom Burgess (an attorney in Birmingham) and Stuart Setcavage (a retired State Farm claims manager from Pennsylvania) to say that, in hindsight, they would have settled this case. (See contemporaneously filed Motion to Strike). Hindsight is not the test in Alabama as insurers, and their counsel, can only be judged in the moment of their decision making. There is no uniform claims practices act adopted into law in Alabama, and any attempt to apply case law (or the standards and practices from other states) to

the facts of this case is merely an attempt to give a legal opinion is not allowed. Auto-Owners has moved contemporaneously with this motion to strike these experts for not applying the correct the standard of liability to their review of the case. Their entire methodology is based on noting more than *post hoc*, "I say so," hindsight.

## IV. ARGUMENT

### A.   Thomas is a straw-man plaintiff, and the he has no standing to sue on behalf of others, thus precluding judgment in his favor.

Alabama law prohibits assignment of bad faith claims to third parties. *Dumas Bro. Manufacturing Co. v. Southern Guaranty Ins. Co.,* 431 So.2d 534 (Ala. 1983)(third party may not sue for any portion of the original judgment exceeding policy limits). However, that is exactly what Thomas did when he entered into a "Fee Share Agreement" with the underlying plaintiffs, disguised with another name. Thomas had signed a cooperation agreement with Auto-Owners, having never actually paid a single dollar premium to Auto-Owners for the protection of this coverage and the huge expense and effort Auto-Owners undertook to defend him. The terms of that cooperation agreement referenced the insuring policy, which specifically states that any rights derived from the policy are not assignable.

Thomas was otherwise judgment proof, penniless with no assets. Yet the "Fee Share Agreement" created the *appearance* of an asset (possible future excess liability claim) that otherwise did not exist. Thomas is now nothing more than a

proxy for the plaintiffs, standing in their shoes, seeking monies in excess of the Auto-Owners policy limits. This is a *de facto* assignment.

According to this agreement, Thomas would receive a portion of any money paid to the plaintiffs (including monies already paid to the plaintiffs). That is simply not his money to collect upon (it is plaintiffs), yet he shares in the spoils? You cannot run a stop sign, hurt other people, change your story in court and in front of a jury about an issue like drinking, and then blame it on the insurance company. Yet that is exactly what the "Fee Share Agreement" does, allowing him to stand in as a proxy to collect monies that would rightfully be someone else's (assuming he had assets to collect upon in the first place).

If this were not egregious enough, underlying plaintiffs, who would otherwise not have a right to seek tort claims against Auto-Owners, are looking to enrich themselves on monies potentially awarded to Thomas as a disguised *quid pro quo* for not seeking collection on the front end from an otherwise penniless defendant. Such transferred rights and interests between these two <u>adverse</u> parties is inconsistent with Alabama law and should be abhorrent to public policy as another form of champerty.[9]

---

[9] Defined by <u>Black's Law Dictionary</u> (10th ed. 2014) as "an agreement to divide litigation proceeds between the owner of the litigated claim and a party unrelated to the lawsuit or helps enforce the claim."

Without the existence of the "Fee Share Agreement," the rights of any of these

recoveries simply would not exist:

> An insurer's bad faith refusal to pay is considered an intentional tort and a "species of fraud." *See Wooley v. Shewbart,* 569 So.2d 712, 719 (Ala.1990) (Hornsby, C.J.) (concurring in part and dissenting in part); *see also Vincent v. Blue Cross–Blue Shield of Ala.,* 373 So.2d 1054, 1064 (Ala.1979) (Jones, J., concurring); *McLeod v. Life of the S. Ins. Co.,* 703 So.2d 362, 364 (1997). "[I]n the absence of statutory provision, rights of action purely personal do not survive, and are not assignable" to third parties. *Birmingham v. Walker,* 267 Ala. 150, 101 So.2d 250, 259 (1958).
>
> While Alabama law permits the assignment of contractual obligations and rights, *see* Ala.Code § 8–5–20 (1975), the statute must be read consistently with the Alabama Supreme Court's unambiguous characterization of bad faith actions as tortious, rather than contractual in nature. *See Chavers v. National Sec. Fire & Cas. Co.,* 405 So.2d 1, 5 (Ala.1981) (per curiam). Given that such tortious conduct is intentional, fraudulent, and personal, it cannot be the subject of assignment. *See Kirkpatrick,* 266 So.2d at 271; *Terrell v. Lawyers Mut. Liab. Ins. Co. of N.C.,* 131 N.C.App. 655, 507 S.E.2d 923, 926 (1998).

*Cash v. State Farm Fire & Cas. Co.,* 125 F. Supp. 2d 474, 477 (M.D. Ala. 2000).

The whole idea of the "Fee Share Agreement" is a farce, a fiction by which

Thomas stands in the shoes of those who are otherwise not entitled to bring tort

claims against Auto-Owners and obtain a recovery. This is a disguised assignment,

which is disfavored by Alabama law. Since such assignments are disfavored, and the

underlying plaintiffs, the real parties in interest, are merely using Thomas as a proxy

in order to obtain a result they would normally not be allowed to bring, Auto-Owners is entitled to judgment as a matter of law for lack of standing.

**B.      Court should apply the Correct Standard by which to Judge an Insurer's Conduct on a Third Party Failure Claim, or Alternatively, Seek a Certified Question of the Alabama Supreme Court.**

Thomas' counsel has successfully argued in a recent federal court case that a case of bad faith is based on a "totality of circumstances" test for which a multitude of factors involved in the decision to settle a case are for a jury to decide. (See, Exh. 35, *Franklin v. Nat'l Gen. Assur. Co.*, No. 2:13-CV-103-WKW, 2015 WL 350633 (M.D. Ala. Jan. 23, 2015)). *Franklin* incorrectly applies Alabama law as it relates to an insurer's duty to settle a third party claim. Auto-Owners invites the court to examine the historical definition of the tort of bad faith, especially regarding the defense of third party claims. If necessary, this Court should seek a certified question to the Alabama Supreme Court to reconcile this question of law.

1.    *Historical Review of the Third Party Failure to Settle Claims*

Alabama courts have long confirmed that there is no cause of action for negligent claim handling. S*ee Kervin v. S. Guar. Ins. Co.*, 667 So. 2d 704, 706 (Ala. 1995) ("[T]his Court has consistently refused to recognize a cause of action for the negligent handling of insurance claims …"). However, in the third party context, an insurer can be held responsible for the full amount of a verdict against its insured if

it was negligent in failing to settle in light of policy limit demands. S*ee Waters v. American Casualty Company of Reading, PA*., 73 So.2d 524 (Ala. 1953).  Plaintiff argues that this liability is clear under Alabama law.  It is not.  A look at the (sparse) case law on the subject reveals just how murky the waters are and, if anything, supports Auto-Owners' position that there can be no finding of bad faith when the insurer shows any "legitimate or arguable reason for failing to pay the claim." *Mutual Assurance v. Schulte*, 970 So.2d 292 (Ala. 2007).

The starting point is *Waters v. American Casualty Company of Reading, PA*. 73 So.2d 524.  A woman sued the owners of the Delmar Theater in Birmingham after she sat in a seat with no bottom.  *Id*. at 256.  The theater owners' insurance company refused to settle the claim for its $5,000 limit.  *Id*.  After an excess verdict was returned, Waters sued, alleging bad faith on the part of the insurer.  The question for the Alabama Supreme Court was whether the liability for the insurer to pay the excess judgment (now recognized) had its roots in the law of general negligence or could there be a case for third party bad faith such that punitive damages could be assessed against the insurer. *Id*. at 528.

The Court held "that there may be liability under both rules." *Id*.  It delineated the difference between either standard of liability as to whether the insurer failed "to exercise reasonable care in performing the duties required of the insurer" (negligence) or whether the lack of due care was due to "an intentional failure to

perform those duties." (bad faith) *Id*. at 529.  While the Court made clear that the claims are separate and independent torts, it declined to distinguish between the two any further because the two terms "have a well understood meaning." *Id*.

The Alabama Supreme Court revisited the *Waters* decision in *State Farm v. Hollis*, 554 So.2d 387 (Ala. 1989), but the case is of little use in distinguishing between the two causes of action.  In *Hollis*, the Alabama Supreme Court was asked to determine the quantum of proof necessary to advance a claim for <u>negligent</u> failure to settle a claim. (*Id*., at 390).  It is important for this discussion that plaintiffs in *Hollis* did not bring a claim for bad faith. (*Id*.).  In citing the standards for proving negligent failure to settle, the court cited a host of factors from a decision of an intermediate Pennsylvania court, which essentially advocated for a "totality of the circumstances" test. [10]   (*Id*. at 391). In its only statement regarding bad faith, admittedly occurring in *dicta* since the issue was not before the Court, *Hollis* stated that bad faith failure to settle was much different than negligence because a bad faith claim requires an "<u>intentional</u> failure to settle a claim." (*Id*. at 392)(<u>emphasis added</u>).[11] Such level of intentional conduct would have to arise in the bad faith

_____

[10]   *Hollis* acknowledged that the Pennsylvania court at issue conflated negligence and bad faith for claims arising in the third party insurance context, as other courts have done.

[11] A third case addressing the issue essentially states nothing more than that an insurance company acted in bad faith if it failed to act "in good faith and deal fairly

context, since, as stated in a footnote, "a finding of negligence alone would not warrant an award of punitive damages, whereas a finding of bad faith would." *Id*. at 391 fn. 2

The final case addressing the issue, *Mutual Assurance v. Schulte*, 970 So.2d 292 (Ala. 2007), delivers the Alabama Supreme Court's clearest statement differentiating between bad faith and negligence in the third party context.   In *Schulte*, the Court was presented with both a claim for negligent failure to settle and a claim for bad-faith failure to settle.  *Id*. at 296.  There, the court said:

> [A]lthough the facts necessary to establish these separate claims are usually closely related, the claims do require different proof. To succeed on a claim alleging negligent failure to settle, a plaintiff must establish that, considering all the circumstances, the insurer in deciding not to settle the claim failed to exercise reasonable or "ordinary care," that is, such care as a reasonably prudent insurer would have exercised under the same or similar circumstances. *Waters,* 261 Ala. at 259, 73 So.2d at 529. However, the inquiry relevant to a claim alleging bad-faith failure to settle is whether the insurer's failure to settle had any "lawful basis," that is, whether the insurer had any " 'legitimate or arguable reason for failing to pay the claim.'"

*Mut. Assur., Inc. v. Schulte*, 970 So. 2d 292, 296 (Ala. 2007).  Thus, per the logic in *Schulte*, in order to prevail on a claim for "bad faith "failure to settle, a plaintiff must

---

with the insured." *Hartford Accident and Indemnity Company v. Cosby*, 173 So.2d 585 (Ala. 1965).  Such circular logic is obviously of no use here.

demonstrate that the insurer had no "legitimate or arguable reason for failing to pay the claim" at the time of its refusal.  *Id.*

Counsel for Thomas has successfully argued that *Schulte's* statement was mere *dicta*. (Exh. 35 (*Franklin*); *Leo v. Alfa Mut. Ins. Co.*, No. 1:13-CV-1826-VEH, 2016 WL 1180108, at *1 (N.D. Ala. Mar. 28, 2016) (copying and pasting the *Franklin* holding and its analysis without providing any additional insight). In each of these cases, the court incorrectly concludes that when reading these Alabama cases together, Alabama only has one standard of proof, and, thus, all facts and circumstances must automatically go to a jury. *Id.*  In effect, what these cases did, without seeking a clarification from the Alabama Supreme Court, was conflate the two torts as one and the same, which flatly contradicts the history of both negligence and bad faith in Alabama law.[12]

The Court need not follow the *Franklin* decision. It carries no precedential value and was, in any case, wrongly decided. It was an unpublished denial of summary judgment, not a decision of the Alabama Supreme Court defining bad faith in the third party context.  More importantly, while casually dismissing as *dicta* the statement from *Schulte* delineating the two torts, *Franklin* relied heavily *Hollis* as

---

[12] See and compare the Alabama Jury Instruction on Negligent Failure to Settle at APJI – Civil § 20.45 and the Instruction on Bad Faith at §20.37.

defining the standard for *bad faith failure to settle* in Alabama. That is demonstrably incorrect as there was no claim of bad faith before the *Hollis* court.

By erroneously relying on *dicta* in *Hollis*, Franklin adopted the reasoning giving rise to that *dicta* from an intermediate Pennsylvania court's analysis. The Pennsylvania court, however, was only attempting to define the standard of proof for a *negligent failure to settle* claim. So, in effect, *Franklin* elevates a distinguishable Pennsylvania court decision—cited by the Alabama Supreme Court in defining the standard for a negligent failure to settle claim—over direct pronouncements of the Alabama Supreme Court defining bad faith as a completely different creature with a different standard of proof.

This case presents an opportunity to correct the misstatement of law in *Franklin*, and apply the correct standard to the facts in this case. Alternatively, this court should consider certifying to the Alabama Supreme Court a question seeking to define the true distinction between "negligent failure to settle" and "bad faith failure to settle."

2.    *The standard of liability should be viewed in light of Thomas' pursuit of punitive damages.*

In dealing with punitive damages, this court should be also be mindful of the Due Process rights involved. Specifically, such rights require that a defendant have advanced notice of the type of conduct that may subject him to a financial penalty that could be substantial.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408,

417 (2003) ("[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice  not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose.") (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996)). Equalizing the standards required of negligence and bad faith robs defendants of the ability to determine *ex ante* the type of behavior that may subject them to such punishment, and as such, deprives them of fair notice.

In Alabama the notice to insurers like Auto-Owners is that punitive damages may only be awarded when there is clear and convincing evidence of fraud, malice (intent), or wantonness. Ala.Code § 6-11-20 (1975) (necessary for there to be clear and convincing evidence of conscious or deliberate conduct occurred). This is why *Schulte's* statement providing a clear distinction between negligent failure to settle and bad faith failure to settle represents sound policy.  Absent a clear distinction (negligence v. conscious and deliberate conduct), no insurer can safely rely upon its own claims handling experience or well-reasoned defense counsel positions as protection against a punitive damages award. Every decision by an insurer to reject a demand for policy limits would expose the insurer to a jury question over punitive damages. When employing a "hindsight standard," as Thomas' counsel wishes to do by pointing to the high verdict and affirmance of appeal, a plaintiff would need only hire a couple of "experts" to testify they would have settled this case. This

ameliorates any need for evidence of an intent to act on Auto-Owner's own self-interest over Thomas without any justification (classic bad faith).

     3.    *Auto-Owners did not act in bad faith*

  Auto-Owners clearly did not intentionally fail to meet or perform its duties and had "legitimate or arguable reason for failing to pay the claim." The reasonableness of an insurance company's decision not to settle is judged by the information that were before it at the time the decision was made, *see Nat'l Sav. Life Ins. Co. v. Dutton*, 419 So. 2d 1357, 1362 (Ala. 1982). Auto-Owners had Shirley's repeated recommendations to deny the early settlement demands, and when it was time to sit to mediate the case, the plaintiffs would not negotiate off of limits. Shirley, believing in all the information he had in front of him <u>at the time</u> (<u>not in hindsight</u>), believed his evaluation that the case was worth less than those limits was correct. He advised Auto-Owners on the law of the jurisdiction, the questions in his mind about the level of impairment of his client, relayed his client's adamant defense that he was innocent of these accusations, evaluated the witnesses'' testimony and considered the venue so as to come up with a value that he believed was reasonable. All based on forty (40) years of experience defending individuals like Thomas in automobile litigation, never one of which ended up in an excess verdict.

    Shirley advised Auto-Owners that it was correct to evaluate the case based on the compensatory nature of the injuries, alone, and in so doing, that the reduced

medical liens were a factor in gauging settlement value as he had done in dozens of other cases before this one. Auto-Owner's reliance on these facts told them that the case could be negotiated, yet plaintiffs' counsel simply would not come off of limits. There were legitimate reasons to believe there were questions as to value, and it is certainly reasonable to rely upon the recommendations of local, experienced counsel in this regard as the claim reps were experienced and trained to do.

A tome of evidence exists to support Auto-Owners; including their efforts to defend Thomas to the contrary of his own efforts at trial who both the trial court and appellate courts have now declared him to be completely uncredible. Under such circumstances, there can be no clear and convincing evidence of conscious and deliberate conduct on the part of Auto-Owners. Auto-Owners is entitled to judgment as a matter of law on a claim of bad faith and for any recovery seeking punitive damages that does not otherwise meet the clear and convincing evidence standard.

**C.    Auto-Owners fulfilled any duty to defend and indemnify as per the insuring agreement.**

After undertaking Thomas' defense of this case, Auto-Owners retained competent defense counsel, Shirley, a forty (40) year veteran of civil trails in Geneva and Coffee Counties, Alabama. After the verdict, Auto-Owners retained additional appellate counsel who challenged both the issue of Thomas' liability for wanton conduct, as well as the size of the punitive damages.  They cited depositions and post-judgment discovery on the issue of Thomas' inability to pay any judgment --

his being penniless and broke. The appellate effort was nearly successful.  Several Alabama Supreme Court justices agreed the testimony regarding wanton conduct was too weak, and thus a punitive award was not appropriate. The final judgment, however, was adverse to Thomas, so Auto-Owners paid its policy limits. It also paid all costs and interest that had accrued since the date of the final judgment. As such, Auto-Owners met its contractual obligations to defend and to indemnify Thomas up to the amount of the policy limits, plus interest and cost as paid.

The issue for this case (and the subject of this motion) is what, if any remedy exists for Thomas to seek damages in excess of the policy limits in light of Auto-Owners vigorous defense of his case and the payment of these monies. As is argued, given the circumstances of this case, there is no substantial (nor clear and convincing) evidence of bad faith as a matter of law.  To the extent any claim or count suggests Auto-Owners breached any contractual condition on the terms of its policy to defend or indemnify, such should be dismissed and summary judgment entered in favor of Auto-Owners.

**D.     No Obligation to Pay Appellate Bond**

Thomas says that Auto-Owners breached its policy by not paying for and securing an appellate bond after the jury verdict entered against him. This is a red herring since there have been no attempts to execute on the judgment by underlying Plaintiff's counsel. Furthermore, the "bond issue" is answerable from simple

contract review and interpretation of the four-corners of the insurance policy, which states that Auto-Owners would only pay *premiums* on appellate bonds in the event of a verdict against Thomas, but it would "not apply for or furnish such bonds." (Exh. 5 at 01040).

Thomas also claims that the failure to pay the premiums in light of the excess verdict was an indication of bad faith on the part of Auto-Owners. A similar attempt to make an issue of an appellate bond was made in *State Farm Mut. Auto Ins. Co. v. Hollis* where a case of "wanton failure to file a supersedeas bond" was allowed to go to a jury. 554 So.2d 387 (Ala. 1989). There, the court reversed and remanded the case for new trial, ruling that there is no such creature in Alabama. The court noted that while there were arguments to be made that a person may be damaged by the *execution of a judgment* during the pendency of an appeal, there is no separate independent tort for which damages can be sought against an insurer for its failure to post a bond during the pendency of an appeal. Id., at 393 (reasoning that "every element of damages does not give rise to a separate cause of action"). Again, here, there has been no execution of any judgment – instead Thomas is penniless and his only asset is this lawsuit. There is valid cause of action, here, so judgment as a matter of law is warranted in favor of Auto-Owners.

## V. CONCLUSION

Auto-Owners is entitled to judgment as a matter of law on all claims.

Respectfully submitted,

*/s/ John P. Browning*

| | |
|---|---|
| S. Greg Burge | (ASB-0558-B37S) |
| gburge@burr.com | |
| John P. Browning | (ASB-6884-J50B) |
| jbrowning@burr.com | |
| Forrest S. Latta | (ASB-0526-T62F) |
| forrest.latta@burr.com | |
| Taylor Barr Johnson | (ASB-8851-Y78B) |
| tjohnson@burr.com | |

*Attorneys for Defendants,*
*Auto-Owners Insurance Company*
*and Owners Insurance Company*

**OF COUNSEL:**
**BURR & FORMAN LLP**
11 N. Water Street, Suite 2200
Mobile, AL 36602
Tel:   251-344-5151

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing has been served upon counsel of record herein via CM/ECF, email, fax or First Class U.S. Mail, on this the 8th day of May, 2019, as follows:

Keith T. Belt, Jr., Esq.
keithb@beltlawfirm.com
Robert P. Bruner, Esq.
robertb@beltlawfirm.com
S. Drew Barnett, Esq.
drewb@beltlawfirm.com
W. Alan Duke, Esq.
aland@beltlawfirm.com
Belt & Bruner, P.C.
2204 Lakeshore Parkway, Suite 114
Birmingham, Alabama  35209

*/s/ John P. Browning*

Of Counsel

31