UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TIMOTHY J. THOMAS,⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣Plaintiff,⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣⁣⁣⁣⁣)
v.⁣⁣⁣⁣⁣⁣⁣⁣)⁣⁣⁣⁣CASE NO. 1:16-cv-00542-RAH-JTA
⁣⁣⁣⁣⁣⁣⁣⁣)⁣⁣⁣⁣⁣⁣⁣⁣(WO)
AUTO-OWNERS INSURANCE⁣⁣⁣⁣)
COMPANY, *et al.*,⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣⁣⁣⁣⁣)
⁣⁣⁣⁣Defendants.⁣⁣⁣⁣⁣⁣⁣⁣)

## MEMORANDUM OPINION AND ORDER

On September 10, 1897, a 25-year-old London taxi driver named George Smith became the first person ever arrested for drunk driving after slamming his cab into a building.  Though it would take another thirteen years before any American jurisdiction—that of the State of New York—would outlaw driving under the influence, Smith was but a preview.  As time has repeatedly shown, driving plus alcohol can have equally catastrophic consequences for those who share the road with an impaired driver, not just buildings.  Logically, having an impaired insured who causes an accident can have catastrophic consequences also, especially with a local jury.

That was the situation in the underlying case at hand when a Geneva County, Alabama jury was presented with an at-fault traffic accident involving a possibly impaired driver, Timothy J. Thomas (the Plaintiff in this case).  Thomas had been

drinking (at least one tallboy beer by his initial estimate) before he got behind the wheel, and his actions thereafter caused an accident that resulted in serious injuries to three other individuals and over $300,000 in medical bills.  After hearing the evidence, a Geneva County jury issued a combined verdict for $3.8 Million against Thomas.  Thomas was insured, but unfortunately for all, the combined insurance policy limits totaled only $500,000.  Those limits, plus interest, have since been paid.

This case arises from the decision by Thomas' insurer, Auto-Owners Insurance Company ("Auto-Owners" or "Defendant"), not to settle the state court litigation against Thomas, pre-trial, as to all claimants, for the $500,000 policy limits despite being given multiple opportunities to do so.  While the parties have filed several motions that remain pending before this Court, this Memorandum Opinion and Order ("Order") focuses on the dispositive motions filed by Thomas (Plaintiff's MSJ) (Doc. 113) and Auto-Owners (Defendant's MSJ) (Doc. 109).

For the reasons more fully set forth below, having studied the record, hearing oral argument, and considering the parties' every contention, this Court DENIES the Defendant's MSJ in full and GRANTS and DENIES IN PART the Plaintiff's MSJ.

## I.   JURISDICTION AND VENUE

This Court exercises subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Personal jurisdiction over the Plaintiff and Defendant (collectively, the "Parties") and this District's status as a proper venue are both uncontested and

present here.

## II.    STANDARD OF REVIEW

To succeed on summary judgment under the relevant provision of the Federal Rules of Civil Procedure,[1] the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). This Court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). Just as importantly, the Court cannot make decisions as to the merits of properly disputed factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Ryder Int'l Corp. v. First Am. Nat'l Bank*, 943 F.2d 1521, 1523 (11th Cir. 1991).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party asserting that a fact cannot be or is genuinely disputed can support such a statement by citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for

---

[1] In this Order, references to "Rule []" or "Rules" are to one or more of the Federal Rules of Civil Procedure.

purposes of the motion only), admissions, interrogatory answers, or other materials. FED. R. CIV. P. 56(c)(1)(A); *Celotex*, 477 U.S. at 323, 325.  Alternatively, the movant can do one of two things. It can contend that the materials cited do not establish the absence or presence of a genuine dispute. FED. R. CIV. P. 56(c)(1)(B); *Fuller v. SL Alabama, LLC*, 56 F. Supp. 3d 1232, 1236 (M.D. Ala. 2014). Or, if it will not bear the burden of production at trial, it can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. FED. R. CIV. P. 56(c)(1)(B); *see also* FED. R. CIV. P. 56 advisory committee's note to 2010 amendment ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary

4

judgment. *Anderson*, 477 U.S. at 252.

In applying Rule 56, a court must heed two definitions. Applicable substantive law identifies those facts that are material and those that are irrelevant. *Id.* at 248. As a matter of course, disputed facts that do not resolve or affect the outcome of a suit will not preclude the entry of summary judgment.  Meanwhile, an issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 77 U.S. at 249. Essentially, a genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs., Inc*., 276 F.3d 1275, 1279 (11th Cir. 2001).

## III. BACKGROUND

### A. The Collision

On October 15, 2013, Thomas was driving a 1997 Dodge Dakota truck in Geneva County, Alabama, ran a stop sign, and in doing so, struck another vehicle occupied by Randell Heard ("Randell") and his wife, Donna   ("Donna") (collectively, "the Heards"). (Doc. 108-1.) The truck was owned by another individual, Peggy Anderson ("Anderson"). (*Id.*)  At the time of the accident, Thomas shared the truck with a young passenger, Maryah Annis ("Annis"), the teenage daughter of Amber Foster, an acquaintance.  (*Id.; see* Doc. 108-3, p. 20.)  The

accident occurred shortly after Thomas left Foster's house with Annis. (Doc. 108-3, pp. 20-22; *see also* Doc. 108-2, p. 9.)

Thomas imbibed prior the crash, although the amount of Thomas' alcohol consumption was a disputed issue; in his deposition, Thomas *recalled* drinking only one tallboy beer while at Foster's house.  (Doc. 108-2, pp. 12-13, 16-17, 22-23; *see also* Doc. 108-4, p. 16.)  A post-accident blood alcohol test revealed a level of 68 mg/g (equivalent to between .05 and .06 percent), which indicated that Thomas drank more than one tallboy beer before the accident.  (Doc. 108-1; Doc. 108-2, p. 25; Doc. 108-5.)  At trial, while he only conceded that he *possibly* could have had more than one beer, Thomas nonetheless admitted to drinking shortly before the accident.  (*See* Doc. 111-21.)  Thomas also conceded that he may have ingested several medications before the accident, including Seroquel, Neurontin, and Buspar. (*See* Doc. 108-2, pp. 22-23.)

As a result of the crash, the Heards were seriously injured, as was Annis. Donna's injuries included three fractured ribs; crushing injuries to her left foot; numbness, swelling, and bruising to her right knee and lower abdomen; and laceration to her left foot's fifth toe, causing a misalignment that required surgical correction.  (Doc. 121-1, p. 3.)  Her medical bills totaled $55,969.81. (Doc. 121-21, p. 5.)  Randall's injuries encompassed two broken vertebrae that required spinal fusion surgery, a broken wrist, a shoulder injury, two months of nausea, and a

permanent 40% loss of motion in his neck.  (Doc. 121-1, p. 3; *see also* Doc. 108-7, pp. 5-6.)  His medical bills totaled $152,304.67. (Doc. 121-1, p. 5.)  Annis' injuries required intubation at the accident scene and a life flight to a medical facility and included a subdural hematoma brain bleed, facial fractures, lumbar spine fractures, rib fractures, pulmonary contusion, lacerations to her face and scalp, and an open reduction and fixation of jaw fractures, which eventually required the placement of three steel plates in her face.  (Doc. 114-1, pp. 4-5; 121-1, p. 9.)  Her medical bills totaled over $112,000. (Doc. 114-1, p. 5.)

All told, the medical bills of the Heards and Annis exceeded $300,000, although the actual paid amounts on these bills were somewhat less due to contractual write-downs.  (*E.g.*, Doc. 1-9, pp. 3-4.)

## B. The Auto-Owners Insurance Policy

At the time of the collision, the truck was covered by an Auto-Owners insurance policy (Policy No. 95-596-309-00) issued to Anderson with "bodily injury" limits of $250,000 per person and $500,000 in the aggregate. (Doc. 55, pp. 1-2; *see generally* Doc. 55-4.)  The Policy extended coverage to anyone using the truck with the permission of Peggy Anderson; Charles Brooks ("Brooks"), Peggy's then-husband; and Daniel Anderson, all of whom were rated drivers on the Policy. (Doc. 55, p. 2; Doc. 55-4, p. 29; Doc. 55-5.)

### C. The Personal Injury Liability Claims Against Thomas

After receiving a letter of representation from an attorney for the Heards, on October 23, 2013, Auto-Owners opened a claim file and assigned handling of the claim to its Montgomery, Alabama office.  (Doc. 111-3.)  The claim initially was assigned to Cary Manning ("Manning") for handling.  (Doc. 111-4, pp. 14-15.)

Manning's investigation netted several clear conclusions and left only a handful of issues for later determination. At the beginning, Manning focused on issues concerning coverage, liability, injuries, and damages.  (Doc. 111-4, pp. 3, 8, 11-12.)  Naturally, Manning spoke at length with Anderson. (Doc. 111-4, p. 16.) After this conversation, Manning concluded that Thomas had permission to drive the truck, therefore making the accident a covered loss under the Policy. (*Id.*; *see also* Doc. 108-8, p. 8.)

Manning also hired a third-party consultant, Rimkus Consulting Group ("Rimkus"), to evaluate fault and liability. (Doc. 111-4, p. 20.)  Rimkus completed its investigation on November 19, 2013, confirming that the accident was Thomas' fault. (*Id*., p. 21; *see also* Doc. 108-8, p. 23.)  With coverage and liability established, only two issues remained: Auto-Owners' payment of the Heards' property damage claim and the bodily injury claims of the Heards and Annis. (Doc. 108-8, p. 23.)

On December 12, 2013, Thomas Bernardi ("Bernardi"), a senior attorney at Auto-Owners' headquarters, its so-called "Home Legal Office," instructed Manning

to "[p]ut the reserve at the policy limit [$500,000]," and Manning did so the next day.[2] (Doc 121-1, p. 19.)

Meanwhile, things progressed in Geneva County when two lawsuits were filed against Thomas.  On November 29, 2013, Annis filed suit against Thomas, (Doc. 111-6), and two months later on January 24, 2014, the Heards filed their lawsuit against Thomas, (Doc. 111-7).  Both actions later were consolidated (collectively referred to as "the case"). (Doc. 111-8.)

Manning assigned Thomas' defense to Merrill Shirley ("Shirley"), a defense attorney located in Coffee County, Alabama.  (Doc. 111-9; Doc. 111-10.)  Auto-Owners wrote a letter to Thomas informing him of Mr. Shirley's retention as counsel to represent him.  (Doc. 111-9.) The letter also notified Thomas that Auto-Owners would defend him and that it would pay any judgment up to the policy limits, provided that Thomas cooperated in his defense.  (*Id.*)  Thomas confirmed his intent to do so in a signed cooperation agreement that he promptly returned to Auto-Owners.  (Doc. 111-10, p. 4.)

From that point onward, Auto-Owners provided Thomas a full and complete defense without ever sending him a reservation of rights letter or otherwise informing him that coverage may not be available.  (Doc. 108-14, p. 4 ("**At no point**

---

[2] A claims reserve is a money reserve an insurance company deliberately sets aside to use to pay unsettled claims in the future.

has **Auto-Owners ever…issued a Reservation of Rights letter**." (emphasis added)).)

### D. The Case's Progression

Throughout the litigation, Shirley gave Auto-Owners a summary of almost every deposition taken and the impact of that testimony on the case, including depositions of the Heards and Thomas.  (Doc. 111-19; Doc. 121-1, pp. 13-14).  As already noted, in his deposition, Thomas acknowledged that he had been drinking before the accident, although he only testified to drinking one tallboy beer. (*See generally* Doc. 108-2, p. 22.)  Brooks and Anderson also were deposed, and both testified that Thomas lacked their permission to drive the truck, (Doc. 111-33*, p.* 3; *see also* Doc. 111-34, p. 2), but according to Auto-Owners at oral argument, this testimony was never shared with them by Shirley.

The parties deposed the Heards' and Annis' treating physicians and obtained the opinion of two experts regarding Thomas' alcohol consumption and impairment at the time of accident: (1) Doctor Jack Kalin ("Kalin"), the Heards' forensic toxicologist, (Doc. 108-5), and (2) Doctor Jimmie Valentine, MD ("Valentine"), Thomas' clinical pharmacologist, (Doc. 108-13).  Kalin testified via affidavit that Thomas' blood alcohol content indicated that he likely had at least two to three tallboy beers prior to the accident.  (Doc. 108-5.)  Valentine in his testimony agreed

with Dr. Kalin that Thomas likely had more than one tallboy beer.  (Doc. 108-13, p. 16.)

On March 19, 2014, Shirley advised Manning that "[i]t is confirmed that [Tim] was under the influence of alcohol at the time of the accident." (Doc. 108-7, p. 8.)  Eventually, on March 27, 2014, Shirley sent a letter to Manning highlighting Thomas' toxicology report in order for him "to evaluate a reserve increase." (Doc. 121-1, p. 16; *see also* 112-1, pp. 10-11.)   Accordingly, as of this date, Auto-Owners had two opinions on hand from its own people: its retained consultant (Rimkus) had advised that Thomas was at-fault for the accident, and its assigned defense attorney (Shirley) confirmed that Thomas was under the influence of alcohol.

Soon, a new person entered the picture.  Sometime that same month, John Gilmore, another adjuster in Auto-Owners' Montgomery office, was assigned the claim file after Manning left his employment at Auto-Owners.  (Doc. 108-8, pp. 25, 37; Doc. 111-11, p. 3.)  Gilmore first reviewed the file materials in September 2014. (Doc. 111-3, p. 5; Doc. 111-11, p. 4.)  In his deposition, Gilmore acknowledged that he was relying upon Shirley to perform "the bulk of the investigation."  (Doc. 111-11, p. 8.)   Increasing his involvement, on September 26, 2014, Gilmore sent Anderson, the named insured, an "excess letter," (Doc. 108-7, p. 5), informing Anderson that the insurance coverage limits of $500,000 may be inadequate to cover a judgment in the case. (Doc. 121-1, p. 24.)

On November 25, 2014, counsel for the Heards and Annis sent letters to Shirley in which they jointly demanded that $500,000, the stated policy limits, be paid no later than December 16, 2014 to settle the claims in full. (Doc. 121-1, pp. 3-4, 8-10.) Shirley reported the demands to Auto-Owners via email on November 26, 2014. (Doc. 111-12, p. 60.) Auto-Owners, however, did not respond with a counterproposal of any sort. (*E.g.*, Doc. 121-1, pp. 11-12.)

Although Gilmore had sent an excess letter to Anderson in September, Gilmore waited until December 4, 2014 to attempt to send Thomas an excess letter. (Doc. 121-1, p. 12.) The letter notified Thomas of a threat of an excess verdict and that he had a right to advice from his own legal counsel. (*Id.*, p. 20.) The initial December 4th letter to Thomas was returned as undeliverable, and thus Auto-Owners reissued a letter on January 29, 2015. (Doc. 121-1, pp. 11, 22-23.) That subsequent letter also was returned as undeliverable, and after a discussion with Shirley, Gilmore emailed the excess letter to Thomas again on February 20, 2015, which also elicited no response. (Doc. 108-26, p. 4.) Eventually, on March 4, 2015, Gilmore asked Shirley if he could get a proper mailing address for Thomas "proving that he got our excess letter." (Doc. 108-26, pp. 3-4.)

On January 14, 2015, Gilmore emailed Auto-Owners' Home Legal Office with the following assessment:

> Plaintiff counsel has responded to that letter . . . stating that they believe
> we are handling the claim in bad faith because we are not willing to

offer our policy limits yet. . . I previously sent an excess letter to both our named insured Peggy Anderson and the driver Timothy Thomas. Timothy Thomas' excess letter was returned undeliverable and I am concerned that may be an issue. . . . One of the hinging issues is whether or not Timothy Thomas was under the influence of alcohol and medication at the time of accident. . . His blood alcohol level in the ER was 68, which corresponds to .068 per their lab director, which is less than the legal limit of .08. The results were input into the record at 7:04 pm while the accident appears to have happened at about 5 pm. If I were to try to put a dollar figure on each of the plaintiffs right now, I'd have [Annis] at about $75,000, Donna Heard at about $50,000, and Randall Heard at about $200,000. **If Timothy Thomas proved to be intoxicated then the values would be significantly higher and our limits would definitely be inadequate. I understand that Timothy Thomas does not make a very good witness.** Please advise what you would like me to do about the issue with the excess letter not getting to Timothy Thomas and also how you would prefer us to respond to the plaintiff's most recent letter.

(Doc. 121-1, p. 11 (emphasis added).)

The following day, on January 15, 2015, Gilmore entered a note in the claims file stating, "Discussed w/legal. Discussed w/ Def. [Attorney] Advised him to prepare for trial as it doesn't appear Plaintiff is willing to negotiate." (Doc 108-7, p. 4.) In other words, Auto-Owners decided to try the case knowing that Thomas did not make a good witness and that the insurance policy limits would "definitely be inadequate" if the jury concluded that Thomas was intoxicated, which was a fact already made known by Shirley via his letter of March 19, 2014.

Tellingly, another policy limits demand was made on March 20, 2015, but again, Auto-Owners did not respond with a settlement offer of any sort. (Doc. 121-2, pp. 10-11.)

In the following months, events took a decided turn.  First, the alcohol issue was clarified by the two experts, with both of them testifying that Thomas had consumed more than one tallboy beer before the accident.  (Doc. 108-5, pp. 2-4; Doc 108-13, p. 16.)  Next, the Parties scheduled a mediation for July 1, 2015.  (Doc. 111-3, p. 3.)  By then, handling of the claim at Auto-Owners had been transferred again, this time to Loretta Grantman ("Grantman").  (Doc. 111-3, p. 3.)

In advance of the mediation, on June 8, 2015, Shirley sent Auto-Owners a comprehensive evaluation letter.  In this letter, he assigned a total settlement range of $265,000 to $310,000 and a total verdict range of $320,000 to $375,000, broken down in the following manner:

| | |
|---|---|
| Annis: | settlement and verdict = $100,000 - $125,000 |
| Randell Heard: | settlement = $125,000-$135,000, and verdict = $160,000 - $180,000 |
| Donna Heard: | settlement = $40,000 - $50,000, and verdict = $60,000 - $70,000 |

(Doc. 111-19.)  In his deposition, Shirley testified that he believed wantonness (and punitive damages) was defensible because (1) there was a question about whether the blood alcohol reading was correctly recorded at the hospital, (Doc. 111-12, p. 9); (2) Amber Foster had testified that Thomas was in control of himself before Annis got in the truck with him, otherwise she would not have allowed Annis to ride with Thomas, (*id.,* pp. 10-11); (3) Thomas had merely stopped (or was stopping) at a stop

sign but failed to appreciate an oncoming vehicle, (*id.,* pp. 11-12); (4) plaintiffs'
expert could not say alcohol "was impacting or affecting Mr. Thomas," (*id.,* p. 14);
and (5) the defense expert was "strong" in saying that he did not believe the level
found, if correct, suggested recklessness on the part of Thomas, (*id.,* p. 15).
Following receipt of this evaluation, on June 29, 2015, Auto-Owners' Home Legal
Office put settlement authority of $300,000 on the file.  (Doc. 108-18, p. 26.)

The mediation occurred on July 1, 2015, without Thomas being present.  The
Heards and Annis offered to settle for slightly less than the total policy limits.  (Doc.
121-2, pp. 12-13.)  The case, however, did not settle at mediation as Auto-Owners
offered only $200,000 to settle the claims of all three plaintiffs, with $50,000 toward
Annis and $150,000 toward the Heards.  (Doc. 108-16, pp. 11, 54-56; *see also* Doc.
108-7, p. 3.)  The mediation was the first occasion in which Auto-Owners made any
offers to settle the case.

The mediation was followed by another round of letters and a period of
inaction.  Claimants' counsel sent a letter to Auto-Owners on July 2, 2015, the day
following the mediation, reiterating that they had offered to settle their claims for
less than the combined policy limits and offered to keep that offer open for thirty
days.  (Doc. 121-2, pp. 12-13.)

Auto-Owners ultimately responded by increasing Annis' offer to $70,000 on
August 12, 2015, right before the trial was scheduled to start, but it made no further

15

attempts to settle the claims of the Heards. (Doc. 108-7, p. 2; Doc. 108-16, pp. 14-15.)  The final $70,000 offer for Annis was made despite Shirley's pre-mediation recommendation on June 8, 2015 of a settlement value range of $100,000 to $125,000 for Annis' claims.  (Doc. 108-15, p. 3.)

Meanwhile, despite the $300,000 in combined settlement authority from Auto-Owners' Home Legal Office, Grantman never authorized more than $220,000 to settle the three claims. (Doc. 108-7, p. 2; *see* Doc. 108-16, p. 35.) Grantman also never made an offer to settle the underlying claims within the combined settlement ranges recommended by Shirley—$265,000 to $310,000.  (Doc 108-15, pp. 2-6; *see* Doc 108-16, p. 35.) According to Grantman, she was never shown by the plaintiff attorneys why they thought the claims were worth as much as policy limits.  (Doc. 108-16, p. 44.)

### E. Thomas' Involvement in Settlement Negotiations

For his part, Thomas admits that he never demanded that Shirley or Auto-Owners settle the case.  (Doc. 111-12, pp. 58-59.)  He also sent Shirley emails, text messages and Facebook messages purporting to show how he was a victim of lies concocted by the claimants to get money. (Doc. 111-14, pp. 2-13.)  Unbeknownst to Auto-Owners, Thomas was even sending messages during the course of discovery to Amber Foster, offering to settle the case himself, and lamenting how his "like-

family" were wrongfully accusing him of being a bad person.  (Doc. 111-12, pp. 16-19.)

## F.  The Trial

A jury trial was held on August 24, 2015 in Geneva County, Alabama.  The trial did not go well for Thomas or Auto-Owners as Thomas' trial testimony became the focal point.  Among others, Thomas testified that he *possibly* had consumed more than one tallboy beer, although in his deposition, he had testified that he only recalled drinking one. (Doc. 111-21, pp. 3-5; Doc. 121-5, pp. 3-5.)

Thomas' trial testimony was so concerning that Shirley refused to cross-examine Thomas for fear he may change his story again.  (Doc. 111-12, pp. 28-37, 53-54.)  By his own account, Shirley was "very upset with those responses in view of the particular effort to make certain, we didn't need to have a mix-up about whether, you know, he had one beer that afternoon." (*Id.*, p. 34.)

The jury ultimately returned a combined verdict of $3,800,000 against Thomas — $1,800,000 in compensatory damages and $2,000,000 in punitive damages. (Doc. 108-9, pp. 39-40.)

Thomas, through counsel, responded to the verdict with a post-judgment motion for remittitur or new trial.  The trial court denied Thomas' motion, finding Thomas' attempts to cover up and deny the effects of his intoxication had inflamed the jury.  (Doc. 111-24, p. 3.)  The trial court also refused to consider any testimony

by Thomas regarding his inability to pay a large judgment, concluding that he was not a credible witness.  (*Id*.)

## G. The Appeal and Payment of Policy Limits

Following the  verdict, Auto-Owners retained additional counsel and filed an appeal.  (Doc. 55, pp. 3-4.)  Unsurprisingly, Thomas' credibility was a focus of the briefing before the appellate court.   (Doc. 111-31, p. 5, n.2.)   Ultimately, the Alabama Supreme Court affirmed on November 3, 2017, finding that the record showed that Thomas lacked credibility.  (Doc. 111-26.)

After this appellate opinion was issued, Auto-Owners paid $1,238,657.53 to claimants' counsel,[3] which included the $500,000 in policy limits and $738,657.53 in post-judgment interest in partial satisfaction of the verdict. (Doc. 108-18, p. 14.) Auto-Owners also paid the cost fee bills in the total amount of $38,361.84.  (Doc. 111-27, p. 8.)

## H. Post-Verdict Discovery and the Execution of a "Fee Sharing Agreement"

After the trial, Thomas received a letter from attorney Keith Belt, the Plaintiff's attorney in this case, (Doc. 111-32, p. 3.)   Months later, during the pendency of the appeal, Thomas signed a "Fee Sharing Agreement" with the Heards, Annis, their counsel, and Belt's law firm. (Doc. 111-3.)  The Fee Sharing Agreement

---

[3] In effect, Auto-Owners' refusal to pay policy limits before trial resulted in a windfall to the claimants of over $728,657.54.

defined Thomas as a judgment debtor who owed money to Annis and the Heards. (*Id.*)  This agreement further provided that the Heards and Annis would forbear collection efforts on the judgment, provided Thomas filed suit against Auto-Owners. (*Id.*)  It also stated that Thomas retained all claims against Auto-Owners and that Thomas was not assigning his tort claims against Auto-Owners to Annis or the Heards.  (*Id.*)

### I.  This Lawsuit

As the agreement contemplated, Thomas filed this lawsuit against Auto-Owners on July 5, 2016.  (Doc. 1.)  In his Complaint, Thomas raised claims of Negligent/Wanton Failure to Settle, Bad Faith Failure to Investigate, Defend and Settle, and Bad Faith Failure to Indemnify.  (*Id.*)

Auto-Owners filed an Answer, (Doc. 24), and then a Counterclaim, (Doc. 26). Auto-Owners filed an Amended Counterclaim on June 22, 2018.  (Doc. 55.)  In the operative counterclaim, Auto-Owners asserted declaratory judgment claims concerning Thomas' permissive user status and his lack of cooperation. (Doc. 55.)

This Order deals with the Parties' two dispositive motions, both filed on May 8, 2019.[4]

In the Plaintiff's MSJ, Thomas argues for his entitlement to summary

---

[4] The other motions not subject to this Order include Plaintiff's Motion to Exclude Expert Testimony of Taylor Flowers, (Doc. 103), and Defendant's Motion to Exclude Plaintiff's Proffered Expert Witnesses Stuart Setcavage and Tom Burgess, (Doc. 112).

judgment on Auto-Owners' Counterclaim for declaratory judgment because (1) there is no justiciable case or controversy between the Parties, and (2) Auto-Owners is estopped from contesting coverage because it never issued a reservation of rights letter. (Doc. 113.)

In its motion, Auto-Owners pleads for summary judgment for five primary reasons: (1) Thomas lacks standing because he has assigned away ownership of his claims under the Fee Sharing Agreement; (2) the Court should apply the *Schulte* standard as it concerns Thomas' bad faith failure-to-settle claim; (3) Auto-Owners did not act in bad faith because it had a legitimate and arguable reason for not settling for policy limits; (4) Auto-Owners fulfilled its duty to defend and indemnify; and (5) there was no obligation to procure or pay for the supersedeas bond. (Docs. 109, 110.)

## IV. DISCUSSION OF AUTO-OWNERS' SUMMARY JUDGMENT MOTION

### A. Auto-Owners' Strawman and Standing Argument

Auto-Owners' first argument can be simply stated. By virtue of the Fee Sharing Agreement, Thomas has entered into a prohibited assignment[5] of his tort claims against Auto-Owners to a third party and therefore lacks standing to prosecute

---

[5] Although Auto-Owners' argument is premised upon an actual assignment of Thomas' claims, Auto-Owners somewhat walks that back when it characterizes the Fee Sharing Agreement as a "*de facto* assignment" and a "disguised assignment."

any of his claims in this lawsuit.   Conversely, as Thomas contends, the Fee Sharing Agreement is a permissible assignment of proceeds only.

In Alabama, tort claims cannot be assigned to a third-party due to the personal nature of the claim.  *See Birmingham v. Walker,* 101 So. 2d 250, 259 (Ala. 1958); *Cash v. State Farm Fire & Cas. Co*., 125 F. Supp. 2d 474, 477 (M.D. Ala. 2000). Unlike tort claims, Alabama does permit the assignment of contractual obligations and rights.  *See* Ala. Code § 8-5-20. While bad faith actions are somewhat founded in contractual duties, they nevertheless are characterized and treated as tort claims. *See Chavers v. Nat'l Sec. Fire & Cas. Co.,* 405 So. 2d 1, 5 (Ala. 1981) (per curiam).

Although ownership of a tort claim cannot be assigned, Alabama does permit the assignment of proceeds resulting from the recovery on a tort claim.  *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Anderson*, 263 So. 2d 149, 153-54 (Ala. Civ. App. 1972) (adopting rule that proceeds of a cause of action are assignable and such an assignment "does not constitute an assignment of the cause of action of the insured against the tort-feasor.") (citations omitted).

Based on Alabama law and having read the Fee Sharing Agreement, this Court cannot classify the agreement as a prohibited assignment of tort claims.  Nowhere in the Fee Sharing Agreement does it assign Thomas' causes of action to a third-party, i.e., Annis or the Heards; it expressly states the opposite:

> JUDGMENT DEBTOR [Thomas] expressly retains all tortious rights, claims and legal remedies arising out of the DEFENDANT'S [Auto-

21

Owners] negligent, wanton, intentional and/or otherwise tortious conduct involved in selling, placing, and binding the subject insurance contract and in the handling of the underlying claims that resulted in the judgment against JUDGMENT DEBTOR and all resulting harm and damages that have flowed therefrom.  This includes, but is not limited to, all claims for negligent and wanton failure to investigate and settle and bad faith failure to investigate and settle.

(Doc. 111-30, p. 4.)  What the agreement does do, however, is require the Heards and Annis to abstain, suspend, and forgo collection efforts against Thomas on the underlying judgment so long as this lawsuit against Auto-Owners is pending.  In exchange, Thomas agrees to aggressively prosecute the case and, if a recovery is made by Thomas from Auto-Owners, then Thomas must pay the bulk[6] of the recovery to the Heards and Annis.[7]  Practically speaking, this amounts to an assignment of proceeds, not ownership, a legally dispositive distinction.  Indeed, this type of assignment is not too different from contractual assignments of recovery that permit insurance companies, such as Auto-Owners, to subrogate against the recovery of their insureds. *E.g.*, *Anderson*, 263 So. 2d at 153-54.  Furthermore, this type of agreement is not too different from that referenced by the United States Supreme Court in *Campbell v. State Farm Mutual Ins. Co.*, 538 U.S. 408, 413-14 (2003).

This Court concludes that the Fee Sharing Agreement is not a prohibited

---

[6] The allocation turns on the amount of the recovery and the recognition that Thomas has certain damages separate and apart from the underlying judgment itself.

[7] Recognizing that Auto-Owners could cut a deal directly with the Heards and Annis to lessen Thomas' damage claims in this case, the Fee Sharing Agreement also requires the Heards and Annis to pay a portion of any recovery to Thomas' counsel in this case.

assignment of Thomas' tort claims. Instead, it is a permissible assignment of proceeds. But, even if it was an assignment of tort claims that is prohibited under Alabama law, the outcome is no different because ownership of Thomas' tort claims against Auto-Owners would remain with Thomas, who is the rightful person to bring the action in the first place. Accordingly, Auto-Owners is not entitled to summary judgment on this basis.

## B. Thomas' Bad Faith Failure-to-Settle Claims (Counts II and III)

Allegations of bad faith link two of Thomas' causes of action, both of which Auto-Owners argues are due to be dismissed via summary judgment. Count II sets out a claim of bad faith failure to investigate, defend and settle, and Count III makes one for bad faith failure to indemnify.[8] (Doc. 1, pp. 22-30.) In support of his claims, Thomas raises a host of allegations, but simply reduced, Thomas asserts that Auto-Owners acted in bad faith when—given the totality of the circumstances—Auto-Owners refused to settle the case against Thomas within policy limits despite having multiple opportunities to do so. (*Id.*) Auto-Owners thereby intentionally exposed Thomas to an excess judgment, one that is not only uninsured but one that Auto-Owners now refuses to pay. The Parties' contest over this issue boils down to adherence to different legal tests.

---

[8] Count I is a claim for Negligent/Wanton Failure to Settle. (Doc. 1, pp. 19-22.) Auto-Owners did not move for summary judgment on this count.

In its plea for summary judgment, Auto-Owners claims to be entitled to summary judgment as to the bad faith failure-to-settle claim under an "arguable-reason" test. This framework, according to Auto-Owners, provides that "there can be no finding of bad faith when the insurer shows any legitimate or arguable reason for failing to pay the claim." (Doc. 110, p. 21(citing *Mutual Assurance v. Schulte*, 970 So.2d 292 (Ala. 2007).) Applying that standard, Auto-Owners argues it had a legitimate and arguable reason for refusing to pay policy limits because (a) Merrill Shirley, a seasoned defense attorney, recommended against it, (b) Shirley had evaluated the case from a settlement and verdict perspective below policy limits, and (c) Shirley believed that the claimants would negotiate off the policy limits during a mediation. (Doc. 110, p. 27.) As Auto-Owners concludes, "[t]here were legitimate reasons to believe there were questions as to value, and it is certainly reasonable to rely upon the recommendations of local, experienced counsel in this regard as to the claim reps were experienced and trained to do." (*Id.,* p. 28.) Simply put, Auto-Owners pins its legitimate and arguable reason argument primarily on Shirley.

For Thomas, Auto-Owners is clearly applying the incorrect standard as it concerns the analyzation of his third-party bad faith claim under Alabama law. Rather, in his view, Auto-Owners' conduct should be measured by the "totality of

the circumstances" approach.[9]  (Doc. 121, pp. 24-25 (citing *Franklin v. Nat'l Gen. Assur. Co.*, No. 2:13-CV-103-WKW, 2015 WL 350633 (M.D. Ala. Jan. 23, 2015) (Watkins, J.).)  Under that approach, according to Thomas, there is a question of fact as to whether Auto-Owners acted in bad faith, especially since Auto-Owners failed to argue it in its summary judgment motion.  (Doc. 121, pp. 24-25.)

Since the Parties spend a majority of their argument concerning which test to apply, the Court will first address that issue.

### 1.   *The Applicable Inquiry for Thomas' Third–Party Bad Faith Failure-to-Settle Claim*

As already noted, the Parties have contrasting positions regarding Thomas' burden of proof concerning his third-party bad faith failure-to-settle claim against Auto-Owners.  As Thomas insists, the Alabama Supreme Court, as well as federal courts interpreting Alabama law, has concluded that the totality of the circumstances approach applies in analyzing third-party bad faith failure-to-settle claims against insurance companies.  In support of his position, Thomas directs the Court to the

---

[9] Although Auto-Owners fights for application of the arguable-reason approach, it does not make an alternative argument that it still would be entitled to summary judgment under the "totality of the circumstances" test if applied.  According to Thomas, this must be accepted as an admission by Auto-Owners that, like the negligent failure-to-settle claim under the totality of the circumstances test, there are questions of fact thereby precluding summary judgment.  (Doc. 121, p. 25.)  While Auto-Owners made no such argument in its brief in support of its summary judgment motion, it does raise this argument in its reply to Thomas' response.  But as Thomas notes, arguments made for the first time in a reply brief are not properly before the Court.  *See Puckett v. McPhillips Shinbaum*, No. 2:06-cv-1148, 2008 WL 906569, at *24, n. 16 (M.D. Ala. Mar. 31, 2008); *see also Fogade v. ENB Revocable Tr.*, 263 F.3d 1274, 1296 n.19 (11th Cir. 2001) (citing *United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984)).

Alabama Supreme Court's decisions in *Waters v. American Casualty Co. of Reading, Pa*. ("*Waters*"), 73 So. 2d 524 (Ala. 1953), *Hartford Accident & Indemnity Co. v. Cosby*, 173 So. 2d 585 (Ala. 1965), and *State Farm Mutual Automobile Insurance Co. v. Hollis*, 554 So. 2d 387 (Ala. 1989), and federal district court decisions in *Franklin v. National General Assurance Co*. ("*Franklin*"), No. 2:13-CV-103-WKW, 2015 WL 350633 (M.D. Ala. Jan. 23, 2015), and *Leo v. Alfa Mutual Insurance Co*. ("*Leo*"), No. 13-CV-1826-VEH, 2016 WL 1180108 (N.D. Ala. Mar. 28, 2016).

In Auto-Owners' opinion, application of the arguable-reason test to bad faith failure-to-settle claims is compelled by a single statement, encapsulated in a single sentence, made by the Alabama Supreme Court in *Mutual Assurance v. Schulte* ("*Schulte*"), 970 So. 2d 292 (Ala. 2007):

> [T]he inquiry relevant to a claim alleging bad faith failure to settle is whether the insurer's failure to settle had any "lawful basis," that is, whether the insurer had any "'legitimate or arguable reason for failing to pay the claim.'"

*Id*. at 296 (citations omitted).

Of course, as Auto-Owners notes, the *Franklin* and *Leo* courts dismissed this single sentence in *Schulte* as being mere dicta because the *Schulte* court was only considering a negligent failure-to-settle claim, not a bad faith failure-to-settle claim. As additional support, the *Franklin* court referenced three justices' special concurrences in the result, all of which recognized that the majority's holding was

26

limited to the very narrow question of whether the insurance company had an absolute right to rely upon the medical malpractice damages cap under a claim for negligent failure to settle, regardless of any other facts that might or might not exist.

Facing this quandary, Auto-Owners asks this Court to ignore *Franklin* and *Leo* because these cases have no precedential value, were wrongly decided, and impermissibly relied upon dicta from *Hollis* which, in turn, relied upon a decision issued by a Pennsylvania intermediary court. (Doc. 110, pp. 24-25.) Auto-Owners then invites this Court to correct the misstatements in *Franklin* or alternatively certify the question of which test to apply to the Alabama Supreme Court. (*Id.,* p. 25.) Aside from *Schulte*, however, Auto-Owners cites to no other Alabama appellate court cases recognizing application of the arguable reason approach in a third-party bad faith failure-to-settle claim.

Having reviewed all of the cases cited by the Parties and conducted its own independent research, this Court concurs with *Franklin*'s thorough analysis and logic as it concerns the test to be applied in a third-party bad faith failure-to-settle claim in Alabama.  As that court compellingly explained,

> [o]n the basis of the Alabama Supreme Court's decisions in *Waters, Cosby,* and *Hollis,* the court finds untenable NGAC's position that an insurer is not liable on a third-party bad-faith claim where it has an arguable or debatable reason to deny a claim. Neither *Waters* nor *Cosby* nor *Hollis* mentions an arguable-reason test as an element of a plaintiff's third-party claim or suggests that an insurer can prevail if the insured cannot show the absence of an arguable reason for the insurer's refusal to accept a policy-limits settlement of the claim against the insured by

27

a third party. To the contrary, these decisions command a totality-of-circumstances approach. *See, e.g., Waters*, 73 So. 2d at 529 (holding that whether an insurance company acted in bad faith in the exercise of its settlement authority depends upon "all the facts and circumstances").

2015 WL 350633, at *13.  It continued:

> Additionally, in *Waters,* the court rejected an argument similar to the one that NGAC makes in this case. In *Waters,* the insurer had argued that the insured should be "estopped" from asserting that the insurer "was guilty of bad faith or negligence in his decision to try the case ... and not to settle" it because the insured consistently maintained in the underlying action that he had not been negligent. *See* 73 So. 2d at 531. The court disagreed, opining that "[t]hese facts were for the consideration of the jury *along with all the other facts and circumstances of the case.*" *Id.* (emphasis added). *Waters* indicates that an insurer's pre-suit refusal to settle a third-party's claim against its insured based upon the insured's headstrong denial of liability is a factor, but it is not the only factor relevant to the inquiry of whether the insurer engaged in bad faith in the evaluation of a third-party settlement offer. *Hollis* confirms *Waters's* stance. *See Hollis,* 554 So. 2d at 391 ("While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation [of settlement of a third-party claim] requires more.").

*Id.,* at *14.

As in *Franklin*, this Court finds that *Waters* perfectly answers the question at hand, Auto-Owners' doctrinal gymnastics notwithstanding.  There, not only did the Alabama Supreme Court recognize for the first time the tort of bad faith failure-to-settle, but the court also stated that "it is a question for the jury from *all the facts and circumstances* to determine whether the failure on the part of the insurer to make a settlement is an act of negligence or one of bad faith."  73 So. 2d at 529 (emphasis

added).  While negligence and bad faith are separate torts, *Waters* reveals that the same facts and circumstances are relevant for determining the degree of the insurer's culpability, namely, whether the insurer has acted negligently or in bad faith. Although *Waters* did not provide a specific litany, the opinion highlights many, such as whether the insurer exercised ordinary care to ascertain facts and whether the insurer's refusal to settle was based upon an honest judgment of the facts. *Id.*; *see also Carrier Exp., Inc. v. Home Indem. Co.,* 860 F. Supp. 1465, 1479 (N.D. Ala. 1994) (not explicitly referencing the totality of the circumstances approach, but effectively applying it when outlining eighteen factors that the jury was to consider for purposes of determining whether the insurance carrier acted in bad faith). Whether an insurer has a legitimate or arguable reason not to settle, such as the recommendations of defense counsel, is certainly one of the many facts and circumstances that can be considered.

Like the courts in *Franklin* and *Leo*, this Court does not view *Schulte* as creating an arguable-reason standard for two reasons.  First, rather obviously, such a holding undoubtedly would overturn *Waters* without explicitly saying so.  Second, an Alabama appellate court's statement about a claim that was not even at issue or before the appellate court simply cannot be recognized as a new statement of the law. At best, it was dicta, and not even reasoned dicta at that. *See, e.g.*, *Ex parte RCHP-Florence LLC*, 155 So. 3d 1005, 1015 (Ala. Civ. App. 2013) (citing

*Wilkinson v. Rowe*, 98 So. 2d 435, 440 (Ala. 1957) ("If we were to express an opinion based on facts not shown by the record in this case, that opinion would be dicta and would not be binding in subsequent cases.")).

### 2. *Applying the Totality of the Circumstances Test, there is a Question of Material Fact as to the Claim for Bad Faith Failure to Settle*

Glaringly, as attested by the thousands of pages of argument and evidentiary submissions, the Parties' respective summary judgment motions confirm that there are mountains of facts regarding the circumstances that led to a $3.8 million jury verdict against Thomas.  Even when this Court attempted to distill the primary facts for purposes of this Order, its summation still exceeds several pages in length.  Yet, the mere length and number of facts does not govern whether summary judgment should or should not be granted.  Instead, the Court's decision as to both Parties' dispositive motions turns on the facts presented.  Based on those presented, as it concerns Auto-Owners' summary judgment motion regarding the third-party bad faith claim, Auto-Owners' motion is due to be denied.

Here, whether Auto-Owners acted in bad faith in the exercise of its settlement efforts depends upon "all the facts and circumstances."  *Waters*, 73 So. 2d at 529. The facts and circumstances relevant to whether Auto-Owners acted in bad faith, all culled from *Waters, Cosby,* and *Hollis,* include but are not limited to the following: (1) whether Auto-Owners adequately investigated the facts of the case; (2) whether Auto-Owners conducted a dishonest evaluation of the case; (3) how Auto-Owners

30

viewed Thomas' liability; (4) whether Auto-Owners considered the welfare of Thomas; (5) whether there was an opportunity to settle the case within policy limits; (6) whether Auto-Owners evaluated the anticipated range of a verdict, should it be adverse to Thomas; (7) whether Auto-Owners examined the financial risk to Thomas in the event of an excess judgment; (8) whether Auto-Owners considered the strengths and weaknesses of all of the evidence from a liability and damages standpoint; (9) whether Auto-Owners considered the history of the particular geographic area in cases of similar nature; and (10) whether Auto-Owners considered the relative appearance, persuasiveness, and likely appeal of the claimants, Thomas, and the witnesses at trial. *See also Carrier*, 860 F. Supp. at 1479-80  (applying similar considerations).

Under the totality of the circumstances approach, Thomas points to a host of facts and issues as grounds for why Auto-Owners' summary judgment motion should be denied, such as: (1) Thomas' ignorance and lack of sophistication; (2) Auto-Owners' and Shirley's actions in keeping Thomas in the dark to try to save thousands of dollars off policy limits; (3) Auto-Owners' and Shirley's "ridiculously low evaluations" as evidenced by the facts in general; (4) an at-fault accident by an impaired driver; (5) serious and significant injuries to the three claimants with medical bills exceeding $300,000; (6) known pre-trial credibility issues involving Thomas; (7) total combined policy limits of $500,000 to be spread among the three

claimants; (8) Auto-Owners' refusal to pay the policy limits despite repeated demands to do so and when Auto-Owners had internally reserved the claims at $500,000; (9) Auto-Owners' failure to make settlement offers within the range of those recommended by Shirley; (10) Auto-Owners' failure to issue a reservation of rights letter; (11) Auto-Owners' internal decision to try the case despite knowing that a verdict in excess of policy limits was likely if the jury believed that Thomas was intoxicated and despite setting reserves at policy limits;  (12) Shirley's March 19, 2014, communication to Auto-Owners in which Shirley confirmed that Thomas was under the influence of alcohol; and (13) Auto-Owners' failure to include Thomas in the mediation.  Reduced to its bare essentials, according to Thomas, Auto-Owners' repeated refusal to settle the case within policy limits when, internally, it had reserved the claim at $500,000 while knowing that verdict exposure in excess of policy limits was likely, evidences that Auto-Owners' goal was to advance its financial interests over those of Thomas.

Auto-Owners focuses largely on the opinions of Shirley.  As discussed above, Shirley evaluated both settlement and verdict values at less than policy limits, assuming the jury did not believe Thomas was intoxicated or that alcohol was a factor.  As Auto-Owners maintains, it had every right to rely upon Shirley, apparently to the exclusion of all of the other evidence, given that Shirley was a seasoned defense attorney who was familiar with Geneva County.  Aside from

32

Shirley, Auto-Owners seeks refuge in purported collusion by Thomas in the seeming explanation for why he testified differently about his alcohol consumption at his deposition and at trial.

While each of the Parties advance facially credible points and counterpoints regarding why Auto-Owners did and did not act in bad faith, what is undisputed includes the following:

- Thomas had total aggregate insurance policy limits of $500,000 that could only satisfy verdicts of two of the three claimants;[10]

- Thomas was at fault in the accident, per the opinion of Auto-Owners' *own* retained consultant;

- Thomas had been drinking alcohol and had taken medication that could exacerbate the effects of any libation;

- There was conflicting testimony regarding the extent of Thomas' drinking; specifically, while Thomas testified to one tallboy beer, his BAC level and the experts suggested he had more;

- Auto-Owners recognized a level of culpability by Thomas for wantonness[11] since it placed a settlement value on Annis' claims, which were governed by the Alabama Guest Passenger Statute, Ala. Code § 32-

---

[10] The Policy contained limits of $250,000 per occurrence and $500,000 total. Thus, if there was a verdict in favor of all three plaintiffs, the Policy would only cover two of the three. During settlement negotiations, however, counsel for all three claimants demanded the entire limits, which presumably would be spread among the three claimants and would negate the risk of a verdict where two of the three claimants' claims would be covered.

[11] In his case evaluation, Shirley placed a value of $100,000 to $125,000 on the claims of Annis, who was the passenger in the Truck with Thomas. Because she was a passenger, Alabama's Guest-Passenger Statute applied and therefore barred any claim for negligence against Thomas. *See* Ala. Code § 32-1-2. Therefore, Shirley could only justify such a settlement evaluation if he believed Thomas' conduct rose to at least wantonness, which also would trigger the possibility of a punitive damage award.

1-2;

- There were serious injuries to all three claimants, with medical bills exceeding $300,000;

- Auto-Owners failed to respond to the pre-mediation settlement demands with any counterproposals whatsoever;

- The claimants' attorneys made numerous pre-trial offers to settle the claims of all three claimants within insurance policy limits;

- Auto-Owners never offered to settle for the amounts recommended by its *own* retained defense counsel;

- Auto-Owners placed a total claim reserve at policy limits of $500,000, but never offered to settle for this sum;

- Auto-Owners never issued a reservation of rights letter to Thomas;

- Auto-Owners bore complete control over the selection of counsel for Thomas, and the sums to offer and for which to settle;

- Internally, as apparent in its claim file, Auto-Owners knew that an excess verdict was likely if the jury believed that Thomas was intoxicated; and,

- On March 19, 2014, Shirley informed Auto-Owners that Thomas was under the influence of alcohol.

As to counter-balance these inferences, the record contains very little evidence of any efforts or communications by Auto-Owners aiming to notify Thomas (its insured) of the substantial risk of an excess verdict, of the reserves that Auto-Owners had placed on the claims, and Auto-Owners' own concerns about the credibility of Thomas and the impact it may have on the jury, among other matters.

With the above clarified, a threshold concern merits mention.  That is, Alabama appellate courts have recognized that the issue of whether an insurance carrier has acted negligently or in bad faith under Alabama law, generally is a question of fact for the jury to determine. *See Safeco Ins. Co. v. Sims*, 435 So. 2d 1219, 1222 (Ala. 1983); *Waters*, 73 So. 2d at 258; *see generally Ala. Farm Bureau Mut. Cas. Ins. Co. v. Dalrymple*, 116 So. 2d 924 (Ala. 1959).

Here, it will be for the jury to consider whether, under the totality of the circumstances, Auto-Owners acted negligently, in bad faith, or neither in refusing to settle the case.  Looking at the entire record, as this Court must do under Rule 56 and in the light most favorable to Thomas, a reasonable jury could conclude that Auto-Owners opted to ignore the financial risk and exposure to Thomas of an excess verdict for the purposes of advancing its own economic interests.  As to this question of fact, it will be for the jury to resolve.[12]

### 3.  *Under the Arguable-Reason Test, Auto-Owners Still Is Not Entitled to Summary Judgment*.

---

[12] Count II also asserts bad faith failure to investigate and defend.  The parties do not discuss in-depth these aspects of the bad faith claim if at all, instead focusing on the bad faith failure-to-settle claim.  Since the parties do not address it, the Court treats this aspect of the count as abandoned.  Accordingly, Count II will proceed as a claim for bad faith failure to settle.  Count III is a claim for bad faith failure to indemnify, which apparently is premised upon Auto-Owners' failure to pay and satisfy the entire judgment of $3.8 million.  As the parties do not address this claim either, the Court will consider it abandoned as well. However, this oversight may be intentional, as the claimed damages are subsumed and recoverable as part of Thomas' bad faith failure-to-settle claim.

While Auto-Owners spends most of its summary judgment argument on its attempt to convince the Court to apply the arguable-reason test, Auto-Owners actually does little to convince the Court *why* application of this test should result in the entry of summary judgment in its favor as a matter of law. It does nothing more than point to the pre-trial settlement evaluation of Auto-Owner's assigned defense attorney, Shirley. While Shirley's take is a key fact to consider as to whether Auto-Owners acted negligently or in bad faith, its cogency and relevance still would have to be considered by the finder of fact even if Auto-Owners' favored test controlled. On the other hand, Thomas comes forward with sufficient evidence to show a genuine dispute even under this touchstone.

Analogizing to *Carrier Express*, Thomas depicts an evidentiary story more indicative of Auto-Owners' bad faith than that the *Carrier Express* court found more than sufficient. Here, Auto-Owners "preyed on Tim's ignorance and utter lack of sophistication about such matters, kept him in the dark, used him to try to save thousands of dollars", and "when it all went bad, AO [*i.e.*, Auto-Owners] refused to protect him even though it had a clear contractual duty to provide him with an appeal bond." (Doc. 121, p. 45.) Thomas goes on to cite to the expert opinions of Tom Burgess[13], an Alabama attorney who has represented insurance companies and

---

[13] Auto-Owners has moved to strike the expert testimony of Mr. Burgess, which the Court will dispose of via a separate order at a later date. While his opinion testimony is the subject of a motion to strike, it does not affect the outcome of Defendant's MSJ.

36

insureds in motor vehicle accident cases.  (*Id.,* pp. 45-47.)   In his affidavit, Mr.
Burgess testifies to a series of damning inferences: (1) "there was not an honest and
good faith evaluation of the underlying case"; (2) the "damages evaluations were
ridiculously low and unfair as were the settlement offers"; (3) "AO knew that these
were high risk claims based on its $500,000 reserve and its repeated attempts to get
an excess letter to the insured"; (4) "when AO did begin to negotiate it made offers
well-below what was reasonable and even below what was authorized by home
office legal and suggested by counsel"; (5) "AO failed to respond to multiple policy
limits settlement offers, and repeatedly failed to explore settlement possibilities
when it had the opportunity to resolve the claims within limits"; (6)  "AO failed to
keep the insured advised of relevant facts and developments in the case"; (7) Auto-
Owners "failed to keep Thomas informed about the claim"; (8) Auto-Owners refused
to comply with Thomas' demand that the case be settled within policy limits; (9)
"AO failed to heed its own counsel's advice"; and (10) "AO failed to properly react
to adverse developments that continued to occur throughout the case."  (Doc. 112-
3, pp.18-19.)

Further, Thomas points out a key inconsistency in Auto-Owners' primary
argument. That is, although trumpeting the Shirley evaluation as a legitimate and
arguable reason for not settling, Auto-Owners actually did not solely rely, if it did at
all, upon Shirley regarding settlement evaluations and offers to make, because Auto-

Owners never even offered to settle in the range recommended by Shirley ($265,000 to $310,000), or for that internally valued by Home Office Legal ($300,000), or for the $500,000 reserve.  (Doc. 121, p. 49.)  This is so because, according to Grantman at Auto-Owners, Auto-Owners has a "completely different system" from the defense attorney as to how they come up with their settlement evaluations.  (Doc. 108-16, p. 54.)  In other words, from the record, it appears that there is a question of fact as to whether Auto-Owners' supposed legitimate and arguable reason – Merrill Shirley – was really the basis for its settlement decisions in the first place.   The jury will have to decide whether Auto-Owners acted in bad faith when it negotiated in the manner that it did, and on the several occasions when it did not negotiate or respond at all.  Accordingly, Auto-Owners' summary judgment motion as to the bad faith failure-to-settle claim is due to be denied even if the arguable reason test is applied.

## C. The Bad Faith Claim for Failure to Procure and Pay for a Supersedeas Bond.

The Parties also spend effort discussing Auto-Owners' failure to procure and post a supersedeas bond when Thomas, through Auto-Owners, filed an appeal of the jury verdict to the Alabama Supreme Court.   In his Complaint, Thomas asserts that Auto-Owners' failure to procure the bond and pay the bond premium constitutes an independent claim of bad faith.  Auto-Owners moves for summary judgment on this claim, pointing to the language in the insurance policy that placed no obligation on Auto-Owners to procure the bond.  (Doc. 110, pp. 29-30.)  In their briefing, the

Parties acknowledge that there is no recognized independent cause of action for failure to post a supersedeas bond. (Doc. 110, p. 30; Doc. 121, p. 51.) Since Thomas has conceded that he is no longer asserting such a claim, (Doc. 121, p. 51), one that Alabama law does not recognize anyway, Auto-Owners is entitled to summary judgment regarding any affirmative claim by Thomas for bad faith failure to procure or post a bond.

Yet, as Thomas correctly notes, this a recoverable element of damages under a bad faith failure-to-settle claim under Alabama law. (*Id.* (citing *Hollis*, 554 So. 2d at 392-93).) Therefore, to the extent the bond issue has any relevance in this case, it will be only in the context of a recoverable element of damages.

## V.    THOMAS' SUMMARY JUDGMENT MOTION

In response to the Complaint, Auto-Owners filed a counterclaim of its own on December 22, 2017, titled as *Counterclaim for Monetary Relief, Appropriate Sanctions and Declaratory Judgment*. (Doc. 26.) There, Auto-Owners "ask[ed] this Court to adjudge that Auto-Owners is entitled to monetary relief, appropriate sanctions, and to declare that it has satisfied any duty to defend and/or indemnify Plaintiff . . . under an automobile liability insurance policy." (*Id.,* p. 1.) Auto-Owners later filed an amended counterclaim, entitled *Amended Counterclaim for Declaratory Judgment* ("DJ Counterclaim"), which essentially dropped Auto-Owners' previous claims for monetary relief and sanctions. (Doc. 55.)

The DJ Counterclaim brings a declaratory judgment claim, asserting, *inter alia*, that Thomas did not have permission to drive the truck and that Thomas failed to cooperate through his lack of candor and honesty, thereby violating terms of the Policy and thus relieving Auto-Owners of any duty to defend and indemnify Thomas.  (Doc. 55.)  In the DJ Counterclaim, unlike its first counterclaim, Auto-Owners did not seek recoupment or any other relief that sought to claw back defense costs or any sums paid in partial satisfaction of the judgment.

Thomas moves for summary judgment on both declaratory judgment claims, arguing there is no live case or controversy since the underlying case has concluded and since Auto-Owners has paid its insurance policy limits without reservation. Thomas also moves for summary judgment on certain affirmative defenses asserted by Auto-Owners in its Answer.

### A. The Declaratory Judgment Claims and Coverage Defenses Asserted in Auto-Owners' Answer.

Thomas asserts his entitlement to summary judgment on both (1) Auto-Owners' declaratory judgment claims and (2) the related insurance coverage defenses on grounds of lack of standing and waiver.

First, Thomas argues the declaratory judgment claims should be dismissed because they seek "a declaration as to past events and past injuries."  (Doc. 113, p. 14.)  In a similar fashion, Thomas argues that all of Auto-Owners' coverage defenses, such as waiver and estoppel, should be dismissed because they too relate

to past events and not to a live justiciable controversy concerning the Policy. Because these issues are largely identical and overlapping and are premised upon the same underlying facts, the Court will address them together as it relates to standing and waiver.

In particular, Thomas argues that Auto-Owners already has provided Thomas a defense without reservation and already has paid its entire insurance policy limits. (*Id.*)  Therefore, there is nothing to adjudicate as it concerns the Policy or any of the Parties' rights under the Policy.  (*Id*., pp. 14-20.)  In other words, as Thomas portrays it, Auto-Owners' declaratory judgment claims and coverage defenses come too late. (*Id*., pp. 20-23 (citing *Campbell Piping Contractors, Inc. v. Hess Pipeline Co.*, 342 So. 2d 766, 770 (Ala. 1977), and *Burnham Shoes, Inc. v. W. Am. Ins. Co.*, 504 So. 2d 238, 241 (Ala. 1987), *abrogated on other grounds by Williamson v. Indianapolis Life Ins. Co*., 741 So. 2d 1057 (Ala. 1999)).)

And on this issue, Thomas is correct.  Relying on *Campbell*, the Alabama Supreme Court in *Burnham Shoes* clearly answered this question in the affirmative: "[U]nder Alabama law, if an insurer does, in fact, undertake to defend an insured without reserving the right to withdraw its defense, it thereby waives its right to do so." *Burnham Shoes*, 504 So. 2d at 242.  This same principle holds true as it concerns the duty to indemnify.  *Shelby Steel Fabricators, Inc. v. U.S. Fid. & Guar. Ins. Co.*, 569 So. 2d 309, 310-11 (Ala. 1990) (holding that the insurer was estopped to deny

indemnity to the insured after defending, per a non-waiver agreement, for twenty-nine months with no notification of coverage problems prior to its attempt to deny coverage).

Although, in reply, Auto-Owners declares that it does have justiciable coverage defenses because Thomas has sued Auto-Owners for bad faith and negligent failure to settle and because Auto-Owners lacked knowledge of these facts earlier in the case, it overlooks that irreducible constitutional minimum. In the binding words of the Eleventh Circuit, "[i]n order to demonstrate that a case or controversy exists to meet the Article III standing requirement when a [party] is seeking injunctive or declaratory relief, a [party] must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Malowney v. Federal Collection Deposit Group*, 193 F.3d 1342, 1346 (11th Cir. 1999). "Injury in the past . . . does not support a finding of an Article III case or controversy when the only relief sought is a declaratory judgment." *Id.* at 1348. If the party bringing a declaratory judgment action "does not assert a reasonable expectation of future injury, he 'lack[s] standing to bring an action for declaratory relief[.]'" *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1211 (11th Cir. 2019) (quoting *Malowney*, 193 F.3d at 1348).

42

Such is the case here, for at least two reasons.  First, in its DJ Counterclaim, Auto-Owners all but acknowledges that there is no current case or controversy concerning the Policy when it sets forth the following:

> Thomas received the full benefit of Peggy Anderson's policy, including indemnity up to the full policy limits, as well as defense of all claims in the suit below, and a full appeal of the judgment that was entered against him.  Nothing more can be asked of Auto-Owners under these circumstances.

(Doc. 26, p. 9.)

Second, Auto-Owners never reserved, through a letter, agreement, notice or otherwise, a right to claw back any indemnity or defense costs.  *Edwards v. Sharkey*, 747 F.2d 684, 686 (11th Cir. 1984) (holding that a declaratory judgment question was not moot where insurers "contributed to the settlement only after agreeing that their rights would not be prejudiced by the institution and defense of the suit for declaratory judgment."); *Power Corp. v. Amerisure Ins. Co.*, No. 2:12-cv-192-FTM-29DNF, 2013 WL 4523490, at *3, n.6 (M.D. Fla. Aug. 26, 2013) (holding that a declaratory judgment claim did not become moot upon settlement of an underlying case where both sides "agree that it is not moot because payment of the costs of defense incurred by the insured is still at issue.").

To sidestep the foregoing, Auto-Owners excuses its failure to reserve its rights or take action to protect its coverage position by stating that it lacked knowledge of the collusion and permissive use issue until after the jury verdict.  Thomas disputes

this, stating that Auto-Owners never raised a coverage issue until it filed its original Counterclaim on December 22, 2017, despite having knowledge of these alleged issues, which Thomas disputes, before and during trial.  (Doc. 113, p. 25.)

For example, Thomas notes that the factual allegations made by Auto-Owners, such as the permissive use issue, were known by Auto-Owners as early as August 2014.  Then, both Anderson and Brooks testified by deposition to Thomas' permission to drive the truck.  (*Id.*; *see supra.*)  Thomas also points to Auto-Owners' knowledge about the conflicting issue regarding alcohol consumption (dating back to September 2015) and the experts' contrasting opinions regarding their interpretations of Thomas' BAC test results.  (Doc. 113, pp. 26-27; *see supra.*)

Despite having this knowledge, or at a minimum, facts raising a suspicion that there may be issues as both Thomas insists and the record supports, Auto-Owners did nothing.   It did not withdraw its defense.  It did not issue a reservation of rights letter.  It did not file suit contesting coverage. And, it did not refuse to pay its policy limits after the jury verdict was affirmed on appeal.  Instead, Auto-Owners continued to defend, and when the appeal had concluded, Auto-Owners paid its insurance policy limits without qualification or reservation.  If Auto-Owners lacked knowledge as it repeatedly emphasizes in its briefs to this Court, it was only because it chose to ignore the facts before it and made no affirmative efforts to look into it further.

Auto-Owners cannot use its claimed lack of knowledge as a weapon to challenge post-hoc its decisions regarding a defense and indemnity without reservation. Since defense and indemnity are no longer issues in the underlying case, neither are policy provisions such as permissive use and cooperation.  The action before the Court is now a tort case, not a contract case.   In other words, there is no future issue for the Court to resolve, whether that is a duty by Auto-Owners to defend (which it no longer has) or a duty to pay its policy limits (which it no longer has either). *Zurich Am. Ins. Co. v. Southern Owners Ins. Co.*, 248 F. Supp. 3d 1268, 1284, n.7 (M.D. Fla. 2017) ("[A]fter an insurer has provided a defense and that action is complete, a declaration of rights as to a . . . insurer's duty to defend pertains only to a past injury."); *Interstate Fire & Cas. Co. v. Kluger, Kaplan & Berlin, P.L*, 855 F. Supp. 2d 1376,  1381 (S.D. Fla. 2012); *ACE Prop. & Cas. Ins. Co. v. Seneca Ins. Co.,* No. 1:15-CV-3370-TCB, 2017 WL 7805411, at *2 (N.D. Ga. Nov. 30, 2017) (explaining that the conclusion of the underlying litigation mooted the insurer's declaratory judgment action and deprived the court of subject matter jurisdiction over the action); *see also Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP,* 609 F. App'x 972, 975, 979 (11th Cir. 2015).

In short, the Court concludes there is no case or controversy concerning the declaratory judgment claims and the coverage defenses because the underlying case is over from a defense standpoint and because Auto-Owners has paid its policy

limits.   Accordingly, Thomas is entitled to summary judgment on Auto-Owners' declaratory judgment claims (Counts I and II) and the coverage defenses contained in Auto-Owners' Answer, (Doc. 54), including those for estoppel, waiver, and the policy-specific provisions, (Doc. 54, p. 5).

### B.   Auto-Owners' Fault Defenses

The Parties spend a considerable amount of effort in their briefs addressing Auto-Owners' assertion of fault-based defenses, such as contributory negligence, contributory bad faith, and comparative bad faith.   Thomas challenges the factual and legal sufficiency of these defenses in Plaintiff's MSJ as a general matter of Alabama law.   For its part, Auto-Owners again bases these defenses in its general case theme: that Thomas lied about his permission to drive the truck and that he has and is colluding with the claimants as evidenced through his conflicting trial testimony about alcohol consumption and his execution of the Fee Sharing Agreement with them.   Although the Court will not delve into the factual issues that underlie them since such issues are best reserved for trial, it will address the legality of them.

### 1. *The Contributory Negligence Defense*

As Auto-Owners explains, contributory negligence is an affirmative defense to a claim for negligence in Alabama and therefore should be a defense to a negligence claim that is founded in settlement negotiations.   Thomas argues that

contributory negligence is not a recognized defense in this context, nor can it be, since the duty to cooperate, for example, is a contractual duty, not a common law tort duty.  (Doc. 113, pp. 33-35 (citing *M & F Bank v. First Am. Title Ins. Co.,* 144 So. 3d 222 (Ala. 2013)).)  Auto-Owners vigorously argues that such a defense should be recognized, especially given the permissive user and cooperation issues that it raises in its summary judgment brief.[14]  As Auto-Owners and Thomas do seem to agree, such a defense would not apply to a bad faith failure-to-settle claim. Therefore, the Court will only address the defense as it concerns Thomas' claim for negligent failure to settle—and finds it wanting for several reasons.

First, the Court has been unable to find, and the Parties do not cite, any Alabama case law stating that the affirmative defense of contributory negligence can be asserted against a negligent failure-to-settle claim.  A Florida federal district court, however, has spoken to the issue when discussing Alabama law, and that court allowed the defense to proceed:

> Alabama law recognizes no "contributory bad faith" defense to a claim of bad faith.  *White v. State Farm Fire & Cas. Co*., 953 So. 2d 340, 351 (Ala. 2006) (holding that "we pretermit consideration at this time of whether Alabama should recognize 'contributory bad faith' on the part of the insured as a defense to the tort of bad-faith failure to pay an insurance claim, and if we should recognize that defense, what effect it would have upon the tort of bad faith."). But Alabama law recognizes

---

[14] The contributory negligence argument is just one of many mechanisms that Auto-Owners uses to advance its case themes that Thomas lied about his permissive use of the Truck and his collusion with the claimants. These same themes are also presented via Auto-Owners' arguments for declaratory judgment, estoppel, contributory bad faith, and comparative bad faith.

contributory negligence as a complete defense to a claim of negligence. *Kanellis v. Pacific Indem. Co*., 917 So. 2d 149, 155 (Ala. 2005) ("Like any negligence claim, a claim in tort alleging a negligent failure of an insurance agent to fulfill a voluntary undertaking to procure insurance, such as that asserted by the [plaintiff] in this case, requires demonstration of the classic elements of a negligence theory[ ] .... Under Alabama law, however, contributory negligence is a complete defense to a claim based on negligence."). The plaintiff fails to identify any Alabama precedent that bars a defendant from pleading contributory negligence as a defense to a claim of negligent failure to settle. Liberty can plead contributory negligence as a defense to Count I. But Liberty cannot plead contributory bad faith as a defense to Count II and cannot plead comparative bad faith as a defense to Count III.

*MI Windows & Doors, LLC v. Liberty Mutual Ins. Co*., No. 8:14-cv-3139-T-MAP, 2018 WL 2288288, at * 6 (M.D. Fla. May 18, 2018).   Therefore, it is unknown whether such a defense actually exists in Alabama in response to a claim for negligent failure to settle but at least one federal court has concluded that it does.

While at first blush it is easy to argue that an insurance company sued for negligence in failing to settle a claim should be able to argue the insured's contributory negligence as an affirmative defense, given a plaintiff's burden of proof in a negligent failure to settle case under the totality of the circumstances approach, such an argument is hard to embrace.   Already, the totality of the circumstances approach necessarily encompasses a host of considerations for a jury, including the insured's own actions and statements upon which the insurance carrier may have relied, none of which serve as an absolute, complete defense.   If contributory negligence was to be applied, then even the smallest degree of fault by an insured

would serve as a complete defense and thereby would undermine the totality of the circumstances approach in favor of an approach that unduly elevates the actions of the insured no matter how small. The Court is uncertain as to this principle's limits,[15] but for the same reasons the Middle District of Florida in *MI Windows & Doors, LLC* allowed the defense to proceed, this Court will do the same, at least for the moment. Accordingly, Thomas' summary judgment motion as it concerns the defense of contributory negligence is denied.

In so holding, this Court advises both Parties that this does not mean that all alleged negligence or actions of Thomas are relevant to this defense. Auto-Owners clearly bears the burden of proof and must show that Thomas' actions or inactions proximately led to Auto-Owners' decision to refuse to pay its policy limits or to settle the case pre-trial. As the opportunities to settle pretrial were numerous, this inquiry very well may take the form of different activities of Thomas at different stages. But that will not take the form of, for example, trial or post-trial conduct that

---

[15] "To succeed on a claim alleging negligent failure to settle, a plaintiff must establish that, considering all the circumstances, the insurer in deciding not to settle the claim failed to exercise reasonable or 'ordinary care,' that is, such care as a reasonably prudent insurer would have exercised under the same or similar circumstances." *Schulte*, 970 So. 2d at 296 (citing *Waters*, 73 So. 2d at 529). Under this burden of proof, an insurer certainly has the ability to put before the jury "all the circumstances" at the time and all of the considerations by the insurer "in deciding not to settle." Arguably, what Auto-Owners proposes to advance via a contributory negligence defense is already subsumed within the general factors made the basis of Thomas' burden of proof. Presumably, Auto-Owners desires to carve these facts out into an affirmative defense so that it can magnify the facts favorable to its positions which otherwise might get swept up in a jury's overall role in viewing the evidence through the lens of the totality of the circumstances. That in essence would mean that even the smallest amount of fault by Thomas as it concerns Auto-Owner's policy limits denial would serve as a complete bar to Thomas' negligent failure to settle.

had no connection to Auto-Owners' pre-trial settlement positions.  Indeed, the Court notes that it is highly specious to argue, for example, that Thomas' conflicting trial testimony constitutes contributory negligence which should bar negligence committed by Auto-Owners months earlier when it refused to settle the case.

### 2.  *The Contributory Bad Faith Defense*

Plaintiff's MSJ also argues that Auto-Owners' assertion of the doctrine of contributory bad faith is not legally viable.  Problematically, Auto-Owners provides no citation to any Alabama case law in which such a doctrine or defense has been recognized.

The case law, in fact, is sparse.  In the only reported decision in which the Alabama Supreme Court had an opportunity to address this defense, it punted.  *White v. State Farm Fire & Cas. Co.*, 953 So. 2d 340, 351 (Ala. 2006).  It seems, more likely than not, that the Alabama Supreme Court would not recognize such a defense (also called "reverse bad faith"), especially in light of the Alabama Supreme Court's refusal to extend the concept of bad faith outside the actions of an insurance company.  Indeed, two federal courts, presented with a similar argument, have refused to recognize such a defense under Alabama law.  *MI Windows & Doors,* 2018 WL 2288288, at *6; *Cook v. Trinity Univ. Ins. Co. of Kan.*, No. 7:06-CV-02029-LSC, 2007 WL 9717431, at *13 (N.D. Ala. Dec. 13, 2007) ("Since the Alabama Supreme Court has decided to purposely disregard the cause of action of

bad faith by the insured, this Court cannot consider the bad faith claim on the part of the insured.").  Given the Alabama Supreme Court's current failure to recognize the defense and its repeated refusal to expand the concept of bad faith, this Court believes the facts and circumstances of this case weigh against recognizing such a defense.  Consequently, the Court refuses to embrace it, striking it as Thomas asks.

### 3.  *The Comparative Bad Faith Defense*

The same doctrinal defects mar Auto-Owners' effort to assert a comparative bad faith defense. Once more, as Thomas rightly observes, Alabama has not recognized such a doctrine; however, no explicit rejection can be demonstrated either. Whereas it is debatable whether the Alabama Supreme Court would recognize a claim for contributory negligence in a negligent failure to settle case, it is doubtful that Alabama would recognize a comparative bad faith defense.  The only reason that contributory negligence has some sway here comes from the inescapable truism that Alabama recognizes contributory negligence as an affirmative defense to a general negligence claim.  So, there is a colorable possibility that a contributory negligence theory could be maintained in the context of general negligence by an insurance company in handling settlement negotiations. Yet the argument is a bigger leap as to *comparative* negligence or *comparative* bad faith, to say the least, because Alabama is not a comparative fault state.  *See Volkswagen of Am., Inc. v. Marenelli*, 628 So. 2d 378, 386 (Ala. 1993); *Williams v. Delta Int'l Mach. Corp.*, 619 So. 2d

51

1330, 1333 (Ala. 1993).  In short, since Alabama is not a comparative fault state, Auto-Owners' comparative bad faith defense must fail as a matter of law.

### 4. *Auto-Owners' Other Affirmative Defenses*

Thomas also moves for summary judgment on Auto-Owners' affirmative defenses of proximate causation, advice of counsel, collusion, and accord and satisfaction. (Doc. 54, p. 5.)  The Court will deny Plaintiff's MSJ as to these asserted defenses, if they are defenses at all, for now, but will allow Thomas to later challenge them at the directed verdict stage if they remain an issue in this case.

## V.   CONCLUSION

Whether Auto-Owners was negligent or acted in bad faith in refusing to settle the underlying case against its insured within policy limits when given multiple opportunities to do so requires consideration of all the facts and circumstances. *Waters*, 73 So. 2d at 529.  The facts and circumstances here present a genuine dispute of material fact, and therefore Auto-Owners' summary judgment motion on the claim for bad faith failure to settle is due to be denied. It is due to be granted as to the claims for negligent failure to defend and indemnify. Additionally, Thomas' summary judgment motion is due to be granted, in part.

Accordingly, it is ORDERED as follows:

(1) The Motion for Summary Judgment, (Doc. 109), filed by Defendant Auto-Owners Insurance Company as to County II (Bad Faith Failure to Settle)

(Doc. 1, pp. 22-27), is DENIED;

(2) The Motion for Summary Judgment, (Doc. 109), filed by Defendant Auto-Owners Insurance Company as to Count III (Bad Faith Failure to Indemnify) (Doc. 1, pp. 27-30), is GRANTED;

(3) The Motion for Summary Judgment, (Doc. 113), filed by Plaintiff Timothy Thomas is GRANTED in part, and DENIED in part. It is GRANTED as to Defendant Auto-Owners' Amended Counterclaim (Doc. 55), and therefore Counts I and II are dismissed, with prejudice.  It is further GRANTED as to the affirmative defenses of contributory bad faith and comparative bad faith asserted by Auto-Owners in its Answer, (Doc. 54), and therefore these defenses are hereby stricken. The motion is DENIED in all other respects.

DONE this the 17th day of August, 2020.

          s/ R. Austin Huffaker, Jr.
          R. AUSTIN HUFFAKER, JR.
          UNITED STATES DISTRICT JUDGE